William E. MILBURN, Jr., Plaintiff,

v.

Togo D. WEST, Jr., Secretary
of the Army, Defendant.

Sidney L. WALKER, Plaintiff,

v.

Togo D. WEST, Jr., Secretary
of the Army, Defendant.

Civ. A. Nos. 90–1947–LFO, 91–2216–LFO,
92–0207–LFO, and 90–2443–LFO.

United States District Court,
District of Columbia.

June 15, 1994.

Alan J.J. Swirski, Skadden, Arps, Slate, Meagher & Flom, Washington, DC, William D. Patkus, Fairfax Station, VA, for plaintiff Milburn.

Mattie P. Johnson, Washington, DC, for plaintiff Walker.

James Layton, Asst. U.S. Atty. (Omar Zen, U.S. Army Corps of Engineers, of counsel), Washington, DC, for defendant.

## MEMORANDUM

OBERDORFER, District Judge.

Plaintiffs brought these consolidated actions under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e *et seq.* An initial trial before an advisory jury ended in a mistrial in February, 1993. A seven-day bench

trial took place between January 25, 1994 and February 4, 1994. Plaintiff Milburn, in No. 90–1947, and plaintiff Walker both allege disparate treatment in connection with their nonselection for the position of general foreman of the utility, repair, and installation section of the maintenance branch of the Washington Aqueduct Division of the United States Army Corps of Engineers (the "Aqueduct"). In his other actions, plaintiff Milburn alleges that Aqueduct officials retaliated against him after he filed his initial complaint. The record supports findings of fact that sustain the legal conclusions that defendant discriminated against plaintiffs on the basis of race in the promotion decision and that defendant did not retaliate against plaintiff Milburn.

## I. FINDINGS OF FACT

### A. The Washington Aqueduct

The United States Army Corps of Engineers operates the Washington Aqueduct through the Washington Aqueduct Division of its Baltimore District. Defendant, sued in his official capacity as Secretary of the Army, is the civilian official in charge.

The Aqueduct, constructed in 1852 by the Corps of Engineers,[1] channels water from the Potomac River to reservoirs in the District of Columbia and there treats it for distribution to the public.

The Aqueduct operates under the direct supervision of a chief and a deputy chief. These positions are held by Pericles Costas and Douglas Pickering. The Division is divided into four branches, one of which is the maintenance branch. Each branch is supervised by a branch chief, who oversees two or three sections, each of which, in turn, is supervised by a section chief or general foreman. Sections are further subdivided into units.

In 1988, the Aqueduct Division had fifteen supervisory positions at or above the level of section chief. Although about 60% of the overall work force at the Aqueduct was African American, only one of these supervisory

positions was held by an African American—Ira Thompson, the Chief of the Dalecarlia section in the plant operations branch. Milburn Ex. 30.

In 1988, J. Leonard Ignatowski was chief of the maintenance branch. Bernard White was assistant chief of the branch. Both Ignatowski and White are white.

The maintenance branch is divided into two sections: the electrical service section and the utility, repair, and installation section (the "utility section").

The utility section, where the vacancy at issue occurred, includes seven units, each supervised by a unit foreman. Only one other section in the Aqueduct Division contains as many as three units. Milburn ex's 30, 31.

The majority of employees in the maintenance branch are African American. No African American ever has held the position of branch chief or general foreman in the maintenance branch.

### B. The Maintenance General Foreman Selection

On October 4, 1988, the Baltimore District issued a vacancy announcement for the position of maintenance general foreman in the utility section of the maintenance branch.

The vacancy occurred when White was promoted in April 1988 from the position of maintenance general foreman of the utility section to the position of assistant chief of the maintenance branch.

The vacancy announcement listed three occupations that best reflected the operations of the utility section: pipefitter, WG–4204–10; engineering equipment operator, WG–5716–10; and automotive mechanic, WG–5823–10. Milburn Ex. 1.

The vacancy announcement listed seven "job evaluation criteria" subject to consideration in making the selection: (1) ability to supervise through subordinate supervisors (hereinafter "second-line supervisory" ability), which was listed as the "screen-out crite-

---

[1]. Some slave labor was reportedly employed in the construction. Trial Tr. (Jan. 26, 1994) at 137

(Testimony of Aqueduct Chief Pericles Costas).

rion"; (2) knowledge of different, relevant lines of work; (3) ability to work with others; (4) knowledge of materials; (5) ability to plan and organize work; (6) ability to meet deadlines under pressure; and (7) ingenuity (ability to suggest and apply new methods). Milburn Ex. 1.

Ignatowski, as chief of the maintenance branch, was the selecting official for the vacant position. Ignatowski considered White's input in making the selection.

In making his selection, Ignatowski chose which of the seven job evaluation criteria listed in the vacancy announcement would form the basis for his decision.

Among the applicants for the position were the plaintiffs, William E. Milburn, Jr. and Sidney L. Walker, both of whom are African American and were employed in the maintenance branch in 1988, and Paul Bryant, who is white and who had been working at the Aqueduct for less than a year in a different branch.

Milburn, Walker, and Bryant all were listed on the Form DA 2600 as among the "best qualified" candidates for the maintenance general foreman position. Milburn Ex. 2. Accordingly, Ignatowski conducted personal interviews with all three, as well as most others on the list, regarding the vacancy.

Ignatowski's interview with Milburn lasted about ten minutes. Ignatowski asked few questions; the first involved why Milburn had never chosen to join the military. He asked nothing about Milburn's supervisory experience. Milburn Ex. 81 (Milburn Dec.) at ¶ 11.

Ignatowski's interview with Walker lasted about five minutes. Ignatowski first asked Walker about Cajun food and football and then asked about Walker's view of the position and his supervisory experience. He did not ask Walker about second-line supervisory experience. Jan. 31, 1994 Trial Tr. at 7–8.

In addition to his personal interviews with the applicants, Ignatowski relied on his personal knowledge of the applicants in reaching his decision. Ignatowski had firsthand knowledge of the qualifications of Milburn and Walker because they were employed in the maintenance branch. He lacked firsthand knowledge of Bryant's qualifications.

Ignatowski notified plaintiffs on December 2, 1988 that he had selected Bryant for the position.

On the selection register reflecting his choice of Bryant, Ignatowski indicated that he had relied on three of the seven job evaluation criteria in making his selection: ability to supervise through subordinate supervisors; ability to work with others; and ability to plan and organize work.

At trial, Ignatowski and White offered additional reasons for selecting Bryant, including his "breadth of experience," notably in the military; Bryant's potential to contribute to a planned upgrade of the maintenance branch; and minor disagreements in the past between White and Milburn.

Milburn remains employed today at the Aqueduct Division as foreman of the plumbing and pipefitting unit of the utility section, the same position he held in 1988.

Walker left the Aqueduct Division in late 1991 to take a position with the Department of the Navy and is now employed with the Department of the Army. There is no showing that either of these U.S. government positions has been less remunerative or attractive than the position of maintenance general foreman at the Aqueduct.

Bryant remains employed at the Aqueduct as maintenance general foreman of the utility section, the position at issue here.

C. *Pretext in Defendant's Reasons for the Selection of Bryant*

■ The evidence in the record establishes that it is more likely than not likely that the reasons given by Ignatowski and White for the selection of Bryant constitute a pretext for racial discrimination against plaintiffs.

1. *The Applicants' Qualifications*

Comparison of the qualifications of Milburn, Walker, and Bryant for the position at issue leads to a finding that the reasons Ignatowski gave on the selection register for his selection of Bryant were pretextual.

### a. *Milburn*

At the time of the vacancy announcement, Milburn was foreman (WS–4204–10) of the plumbing and pipefitting unit of the utility section of the maintenance branch. Milburn had interacted with persons from other trades within the maintenance branch. His seven years of experience in the unique working environment of the Aqueduct, first as a pipefitter, then unit leader, and finally unit foreman, made him familiar with its operations and personnel. He reflected this experience on the SF–171 form he submitted with his application. Milburn Ex. 8.

Prior to Milburn's submission of his application, Ignatowski and White completed and signed a supervisor's rating, on which they rated Milburn in the same seven categories that comprised the job evaluation criteria on the vacancy announcement. In each category, Ignatowski and White rated Milburn's "demonstrated ability" as either "4" ("superior") or "3" ("highly acceptable") out of four possible points, for a total of 23 out of 28 possible points. They rated Milburn's demonstrated ability to supervise through subordinate supervisors and ability to plan and organize work "highly acceptable" and his ability to work with others "superior." Milburn Ex. 8.

In 1987, Ignatowski and White wrote in an evaluation of Milburn: "For a relatively new foreman, Mr. Milburn has acted as an experienced supervisor with a high level of self-confidence and dedication to his duties." Milburn Ex. 5 at 7–8. In March 1988, Ignatowski wrote in an evaluation that Milburn was "a highly-motivated and dedicated employee" who had "produced work of the highest craftsmanship." Milburn Ex. 6. White wrote that Milburn was "a[n] exceptional employee ... a hard worker and a dedicated employee...." Milburn Ex. 7. In October 1988, Ignatowski and White completed Milburn's annual performance rating. They indicated that Milburn "exceeded" five listed criteria regarding his performance as a supervisor and "met" the other two. Milburn Ex. 5 at 1.

At the time of the vacancy announcement, Milburn had received several awards and other recognition for his work in the maintenance branch. These were reflected on his application. Milburn Ex. 8.

Milburn had supervised the assistant foreman in the plumbing and pipefitting unit since 1986. Two different individuals held that position under Milburn. He had also supervised others among his six fellow unit foremen in the Utility Section whenever the units performed joint work. He had approximately two years of additional second-line supervisory experience prior to joining the Aqueduct Division.

### b. *Walker*

At the time of the vacancy announcement, Walker was a pipefitter (WG–4204–10) in the plumbing and pipefitting unit. Prior to starting work at the Aqueduct in early 1988, Walker had supervised construction, pipefitting, and welding in the private sector. He had approximately 25 years of experience in a broad variety of construction-related trades.

Walker had five and one half years of supervisory experience, including 18 months of second-line supervisory experience in a total of three previous jobs, and extensive experience as a foreman and worker in the plant maintenance, pipefitting, welding, construction, and electrical trades. Walker's application materials reflected the breadth and variety of his experiences. He did not document all of his prior second-line supervisory experience in his application.

### c. *Bryant*

At the time of the vacancy announcement, Bryant worked in the Aqueduct Division's planning and engineering branch as an electrical engineering technician, a nonsupervisory position. Earlier, Bryant had served for twenty years in the United States Army, with stations in Italy, Turkey, and Egypt, followed by a succession of private sector positions.

Bryant was not supervised by Ignatowski and White. His immediate supervisors completed their rating of him shortly before the selection. They rated him lower than Ignatowski and White rated Milburn. The ratings of Milburn and Bryant for second-line supervisory ability were identical.

Bryant's application reflected only one position involving second-line supervisory experience: a three-year term as an Air Force technical sergeant dealing with power production, eight years before the selection at issue. Defense Ex. 3. Bryant's application did not list any supervisors he had supervised in that or any other position. Bryant had no second-line supervisory experience at the Aqueduct.

Bryant's preselection service at the Aqueduct had been brief. He had received no significant awards or commendations at the Aqueduct. Because Ignatowski and White were not Bryant's supervisors, they had neither a basis nor an opportunity to observe his work.

### d. Comparison of the Applicants' Qualifications

At the time of the selection, both Milburn and Walker had significantly more experience than Bryant in the unique working environment of the Aqueduct and in the specific trades that constitute the work of the maintenance branch. In Milburn's case, this advantage extended to supervisory and second-line supervisory experience. Ignatowski and White knew or should have known these facts.

It was observable to a trier of fact from the application materials and the live testimony of Milburn and Walker that Milburn's total qualifications for the maintenance general foreman position were substantially more impressive than Walker's. In a competition between Milburn and Walker for the position, Milburn should have been selected.

The record does not support a finding that Bryant's second-line supervisory ability, as reflected in his application, was superior at the time of the selection to the second-line supervisory ability of plaintiffs.

The record does not support a finding that Bryant's ability to plan and organize work or to work with others was superior at the time of the selection to these characteristics in plaintiffs. Defendant has failed to present sufficient evidence to carry its burden of showing that these two criteria constituted legitimate, nondiscriminatory reasons for Bryant's selection.

On balance, I find that the reasons Ignatowski gave in the selection register for selecting Bryant constitute pretext for discrimination against plaintiffs based on their race.

### 2. Additional Reasons Offered at Trial

Beyond the reasons listed on the selection register for choosing Bryant, Ignatowski and White testified at trial that they were impressed with Bryant's "breadth of experience," notably in his military career. They placed particular emphasis on Bryant's supervision of foreign nationals and his handling of an inspector general's review in Italy. Milburn and Walker had exposure to members of other races and cultures at the time of the selection, and Ignatowski conceded that Milburn probably could have handled an inspector general's review in the maintenance branch. *Id.* at 116–17. Moreover, more than half of Bryant's military career was spent as a clerk, chief clerk, or publications officer.

Ignatowski testified that Bryant's background would assist in Ignatowski's plan to upgrade the operations of the maintenance branch. Defense Ex. 14 (Ignatowski Dec.) at ¶¶ 9, 15. Ignatowski had never mentioned this reason before the trial. The planned upgrade has not transpired.

White testified that he placed some weight in recommending Bryant to Ignatowski on "minor disagreements" White had with Milburn when he was Milburn's direct supervisor. Jan. 27, 1994 Trial Tr. at 29–32. White could not establish that Milburn had actually been insubordinate during any of these incidents. Similar incidents involving white employees in the past had not deterred their promotions, as for example when White himself was promoted to become chief of the maintenance branch after having been charged with directly disobeying an order of the Aqueduct chief.

On balance, I find that all of the additional reasons that Ignatowski and White offered at trial for Bryant's selection constitute pretext for discrimination against plaintiffs based on their race.

### D. *Supporting Evidence of Discrimination in the Selection*

Several other sets of facts in the record support the finding that the reasons Ignatowski and White gave for selecting Bryant constituted a pretext for racial discrimination. These facts include: 1) evidence that the Aqueduct Division failed to comply with the Baltimore District's Affirmative Employment Program; 2) evidence that the selection of Bryant deviated from the Aqueduct Division's unwritten "promote from within" policy; and 3) evidence that Ignatowski improperly used confidential personnel information in making his selection.

#### 1. *Defendant's Failure to Comply With Its Own Affirmative Employment Program*

At the time the vacancy at issue was filled, the Aqueduct Division was subject to the Baltimore District's Affirmative Employment Program for Minorities and Women (the "program"). The program directed managers and supervisors to provide encouragement, assistance, and training opportunities to minority and female employees.

The program requires that if a minority and a white candidate for a promotion have roughly equal qualifications, the minority candidate should ordinarily be favored for the promotion. In her rating of applicants for the promotion at issue, Baltimore District personnel specialist Karen Maben gave Bryant a rating of 91, Milburn 87, and Walker 79. Milburn Ex. 80. Irene Tackett, the Baltimore District's Equal Employment Opportunity Officer, testified that Milburn's rating was close enough to Bryant's that the program should have applied to the decision. Feb. 2, 1994 Trial Tr. at 90–91.

For 20 years, Tackett has been the Baltimore District's Equal Employment Opportunity officer—the official charged with reviewing every Aqueduct Division promotion decision to ensure that selecting officials have fulfilled their responsibilities to foster equal employment opportunities. In that time, Tackett has never sought a change in any Aqueduct Division promotion decision.

Tackett concluded that Bryant's selection of Ignatowski was made "in accordance with prescribed procedures." Defense ex. 18 (Tackett Dec.) at ¶ 21. Tackett's review was limited to ensuring that each applicant had met the "screen-out" criterion of second-line supervisory experience. She did not review Ignatowski's choice of criteria.

Tackett did not inquire beyond Walker's application materials in assessing whether he met the screen-out criterion. She concluded that Walker had no second-line supervisory experience, despite the fact that she knew Walker could not have been present on the "best qualified" list without having second-line supervisory experience. Tackett also believed, incorrectly, that Milburn's supervision of his assistant foremen did not constitute second-line supervisory experience.

Tackett ordinarily asks a selecting official to justify his or her selection of a white candidate in writing in instances where a minority candidate had roughly equal qualifications. She never asked Ignatowski to justify his selection of Bryant. She did not consider Milburn or Walker roughly equally qualified with Bryant because she believed Bryant's written application demonstrated substantial second-line supervisory experience. Feb. 2, 1994 Trial Tr. at 55–56.

Ignatowski had previously promoted Jerry Chirichella, who is white, to a section chief position in the maintenance branch without seeking an outside candidate, despite the fact that Chirichella had no second-line supervisory experience. Tackett never objected to Chirichella's failure to meet the "screen-out" criterion.

Prior to and including 1988, the Aqueduct Division had no money budgeted for training and advancement of its minority employees. The Baltimore District had a four-year goal in place in 1988 to hire two minorities as wage supervisors. The Aqueduct Division never has met that goal.

Ira Thompson is the only African American ever to hold a position as high as branch chief at the Aqueduct. The Aqueduct has had only two African–American section chiefs, including Thompson, in its history.

Ronald Mardaga, the Aqueduct Division's personnel specialist, testified that no evidence in the selection file indicated that the Aqueduct's supervisors had fulfilled their responsibilities under the Affirmative Employment Program in the Bryant selection. Feb. 1, 1994 Trial Tr. at 58–59.

Every African–American employee or former employee of the Aqueduct Division who testified at the trial in this matter—Joseph L. Barnette, Michael S. Allen, Ira W. Thompson, Mary E. Earby, and plaintiffs William E. Milburn, Jr. and Sidney L. Walker—stated that racial discrimination is a serious problem at the Aqueduct and recounted specific instances of racial discrimination by Aqueduct supervisors. A group of Aqueduct Division employees has recently petitioned Congress for an investigation of racial discrimination at the Aqueduct. Aqueduct Chief Costas and Assistant Chief Douglas Pickering testified at trial that they believe racial discrimination is not a problem at the Aqueduct and that the Aqueduct is not a hostile environment for African Americans. Trial Tr. (Jan. 26, 1994) at 110; Trial Tr. (Feb. 1, 1994) at 66.

Based on the facts stated above, it is more likely than not likely that the Aqueduct Division regularly disregards the requirements of the Baltimore District's Affirmative Employment Program; that the Aqueduct Division disregarded those requirements in this case; and that its disregard reflects an intention to discriminate against plaintiffs based on their race.

### 2. *Defendant's Deviation From Its "Promote From Within" Policy*

Douglas Pickering, Deputy Chief of the Aqueduct, testified that promotion decisions take into account a candidate's experience within the particular branch where he or she seeks promotion and that the experiences of an employee within the branch outweigh the experiences of an employee in another branch. Feb. 1, 1994 Trial Tr. at 73.

Dr. Rebecca Klemm, a statistical expert, testified that the Aqueduct Division has consistently promoted qualified candidates from within its branches over qualified outside candidates, with the only exceptions being Bryant's promotion to the position at issue and another promotion of a white male to be Foreman of the Custodial Unit. Milburn Ex. 85 (Klemm Dec.) at ¶¶ 7–10. The available data did not reflect how many outside-branch candidates competed unsuccessfully for promotions ultimately given to within-branch candidates, because in 1991 the Baltimore District destroyed the selection files that contained this information.

Dr. Klemm testified that the Aqueduct Division has made a large number of promotions on a noncompetitive basis and that African Americans received a lower proportion of these noncompetitive promotions than their representation in the Aqueduct's workforce.

Costas testified that the Aqueduct Division has in the past shifted units from one section to another and has created new units with new supervisors. Costas made Ronald Cornell, a white employee, supervisor of the newly created welding unit in 1993. Trial Tr. (Jan. 26, 1994) at 125–26. Costas acknowledged the possibility that the Aqueduct Division may undergo some degree of reorganization in response to the District of Columbia's 1993 water emergency and that that reorganization may involve the creation of new positions. *Id.* at 126–29, 141–42.

Based on the facts stated above, it is more likely than not likely that the Aqueduct Division, and in particular the maintenance branch, follows an unwritten policy of generally selecting applicants for vacancies from within a branch over approximately equally qualified applicants from outside the branch; that Bryant's promotion was a deviation from this policy; and that that deviation was due to racial discrimination on the part of defendant.

### 3. *Ignatowski's Preselection Use of Rating Numbers*

The Baltimore District does not permit a selecting official to choose an applicant for a promotion until a personnel specialist has given each applicant a numerical rating based upon his or her application materials. District policy prohibits the selecting official—in this case, Ignatowski—from seeing

the personnel specialist's rating numbers prior to the selection. Ignatowski, however, received those numbers, prepared by Karen Maben. He copied them onto a working spreadsheet he developed after interviewing the applicants and before the selection. Milburn ex. 80.

Bryant's background was primarily in electrical work. Ignatowski testified that Bryant's experience with power production was one basis for his selection. Jan. 31, 1994 Trial Tr. at 51–52. The position at issue in these actions involved nonelectrical aspects of the Aqueduct, rather than its electrical operations. Ignatowski conceded at trial that Milburn was more qualified than Bryant regarding the nonelectrical operations of the Aqueduct. Jan. 31, 1994 Trial Tr. at 65. On the spreadsheet, Ignatowski handwrote in red that Milburn was experienced with the nonelectrical facets of the Aqueduct. Milburn Ex. 80.

Ignatowski did not produce the spreadsheet until after the second trial of this matter had commenced. He was aware that an earlier subpoena had sought documents including the spreadsheet. He testified that he had forgotten the spreadsheet existed and immediately produced it after he came across it in his home study. Jan. 31, 1994 Trial Tr. at 71.

Based on the facts stated above, it is more likely than not likely that, in making the selection at issue, Ignatowski improperly relied on the personnel specialist's numerical rating of the applicants and that he concealed his reliance on that information. His reliance and concealment reflect an intention to discriminate against plaintiffs based on their race.

### E. *Milburn's Retaliation Claims*

#### 1. *The 1990 Memorandum for the Record*

On August 10, 1990, White directed Milburn not to perform routine maintenance on a lime machine on August 14, 1990 because the maintenance procedure would produce a discharge, and a visiting dignitary would be at the Aqueduct that day. White did not tell Bryant, Milburn's immediate supervisor, how he had instructed Milburn. On August 14 the lime machine backed up, and Bryant ordered Milburn to find two workers to perform the maintenance work. Once he had selected the workers, Milburn entered Bryant's office and told Bryant, in White's presence, words to the effect of "I have the men. What do you want me to have them do?" Bryant claimed that this remark and Milburn's mannerisms reflected an "arrogant attitude" on Milburn's part.

Based on this incident, Bryant accused Milburn of insubordination on August 15, 1990. Bryant later memorialized the charge in a Memorandum for the Record, which stated that "further incidents of this nature" would lead to disciplinary action. Milburn Ex. 16.

Bryant requested formal disciplinary action against Milburn based on the August 1990 Memorandum. The Baltimore District denied this request on December 20, 1990. The request made the Memorandum a permanent part of defendant's records.

At the time Bryant gave the Memorandum to Milburn, Milburn had several EEO complaints pending against the Aqueduct Division. On August 13, 1990, two days before Bryant charged him with insubordination, Milburn filed this federal case challenging Bryant's selection. Ignatowski, White, and Bryant knew about these complaints. The record does not support a finding that Milburn's filing EEO complaints or this action caused Bryant to charge Milburn with insubordination or to write the Memorandum.

#### 2. *The 1990 Performance Rating*

In early January 1991, Bryant gave Milburn his 1990 Civilian Performance Rating, covering the period November 1, 1989 through October 31, 1990. That Performance Rating concluded that Milburn's performance had been "fully successful," based on his having "met" four of seven listed criteria and "exceeded" the three others.

Bryant told Milburn that he based one of Milburn's "met" ratings on a January 1990 incident in which a chlorine line had exploded. In that incident, Bryant ordered Milburn to run chlorine through a line without following the standard procedure of first

"purging" the line with nitrogen. When the line was put back in service the next day, it exploded, requiring work delays and overtime labor for cleanup. Costas, then Acting Chief of the Aqueduct, subsequently exonerated all Aqueduct Division employees from blame for the incident.

Bryant also testified that he based the 1990 Rating on his belief that Milburn had supervised his employees too closely and had attempted to turn in performance appraisals for his employees too soon. Bryant conceded that the previous year he had told Milburn that Milburn had not supervised his employees closely enough and had turned in paperwork too late. January 26, 1994 Trial Tr. at 70–72. Bryant testified further that the 1990 Rating also reflected several accidents that had occurred under Milburn's supervision.

Milburn's 1990 Civilian Performance Rating entitled him to up to a 4% salary bonus. Had he received additional "exceeded" ratings on two of the four criteria as to which he received "met" ratings, he would have been eligible for up to a 7% bonus. Performance bonuses at the Aqueduct are awarded at the discretion of the awardee's supervisor, subject to availability of funds.

Milburn had received a larger number of "exceeded" ratings on his 1988, 1989, and 1991 Performance Ratings than on his 1990 rating. However, each of those Ratings, like his 1990 rating, also concluded that Milburn's performance had been "fully successful." The record does not support a finding that Milburn's filing EEO complaints or this action caused any aberration in his 1990 rating.

## II. CONCLUSIONS OF LAW

### A. The Maintenance General Foreman Selection

 Plaintiffs contend that defendant violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, by discriminating against them based on their race in failing to select them for the vacant maintenance general foreman position in the utility section. In order to establish a prima facie case of individual race discrimination under Title VII, a plaintiff must show that (1) he belongs to a racial minority; (2) he applied and was qualified for a vacant position; (3) he was rejected for the position; and (4) a white applicant with equivalent credentials was offered the position or, alternatively, that the position remained open and the employer continued to seek applicants with the plaintiff's qualifications. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802, 93 S.Ct. 1817, 1824, 36 L.Ed.2d 668 (1973).

 Once these facts are established, the employer must produce "evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 1094, 67 L.Ed.2d 207 (1981). When the employer's nondiscriminatory reason has been presented, the presumption of discrimination " 'drops from the case.' " *St. Mary's Honor Center v. Hicks,* —— U.S. ——, ——, 113 S.Ct. 2742, 2747, 125 L.Ed.2d 407 (1993) (quoting *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1095). The plaintiff then has the opportunity to demonstrate that the employer's proffered reason was not the true reason for the decision. A demonstration that the employer's proffered reason was pretextual permits the trier of fact to infer the ultimate fact of intentional discrimination. The plaintiff at all times retains the ultimate burden of persuading the trier of fact " 'that the defendant intentionally discriminated against [him]' because of his race." —— U.S. at ——, 113 S.Ct. at 2753 (quoting *Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093).

In this case, defendant conceded at the close of trial that both plaintiffs had demonstrated the elements of a prima facie case of racial discrimination as required by *McDonnell Douglas.* Feb. 4, 1994 Trial Tr. at 70, 72. Both Milburn and Walker are African American. Both applied for the Maintenance General Foreman position at issue in this action, completing the required application materials and submitting to personal interviews with Ignatowski. Both plaintiffs were passed over for the position. The position was offered to Bryant, a white applicant whose qualifications were, for the purposes of the prima facie case, equivalent to plaintiffs' by virtue of the presence of all three on the "best qualified" list.

Defendant professes that it selected Bryant over plaintiff for several legitimate, nondiscriminatory reasons. First, defendant points to the selection criteria that Ignatowski chose to emphasize in reaching his decision: second-line supervisory ability; ability to plan and organize work; and ability to work with others. Nothing in the selection process appears to constrain the selecting official's ability to choose criteria, even if the choice appears to be arbitrary or capricious. In addition, defendant stresses Bryant's advantage in what defense counsel at trial termed "breadth of experience," a phrase never employed by Ignatowski or White.

On their own terms, the legitimate, nondiscriminatory reasons defendant offers contain several deficiencies. Second-line supervisory ability, the first selection criterion on which Ignatowski claims to have relied in selecting Bryant, was the "screen-out" criterion for the maintenance general foreman position. It is a reasonable inference from the record, including their appearance on the "best qualified" list, that all three candidates had such ability. For over two years, Milburn had supervised through subordinate supervisors at the Aqueduct, his own assistant foremen as well as foremen in other branches whom he supervised on interbranch products. Shortly before the selection Ignatowski and White themselves rated his second-line supervisory ability as highly as Bryant's supervisors rated his. Milburn also had approximately two years of second-line supervisory experience in earlier employment. Walker was not an Aqueduct supervisor, but he had supervised through subordinate supervisors in a variety of recent jobs in the construction trades. Bryant's second-line supervisory experience came eight years before the selection, in a military position he held for three years. In terms of number of positions, total amount of experience, recency, apparent quality, and relevance to the work of the maintenance branch, Bryant's second-line supervisory experience was not demonstrably superior to plaintiffs'.

Faced with the incapacity of Bryant's actual second-line supervisory ability to justify his selection, defendant argues that plaintiffs failed to emphasize their second-line supervi-

sory experiences prominently enough to demonstrate that they were comparable to Bryant's. This contention is not credible. Both plaintiffs appeared on the "best qualified" list. The facts show that Bryant's application materials gave the officials involved in the selection no basis for concluding that Bryant had superior second-line supervisory experience. None of the three candidates' application materials listed particular supervisors whom he had supervised, so Ignatowski could not have differentiated on that basis. Only Milburn had second-line supervisory experience known firsthand to Ignatowski or White.

As to Walker, defendants point out that his application listed no second-line supervisory experience at all. But this fact, combined with his apparently contradictory presence on the "best qualified" list, should have prompted Ignatowski to inquire as to how Walker met the screen-out criterion. The personal interview provided the ideal opportunity for that inquiry, but Ignatowski conducted only cursory interviews with both Walker and Milburn, failing to use the opportunity to flesh out their qualifications.

Defendant also contends that Ignatowski reasonably based his decision on Bryant's superior abilities to plan and organize work and to work with others. As with second-line supervisory ability, neither Ignatowski nor White had any firsthand knowledge of Bryant in these areas, whereas they had been able to observe both Milburn's and Walker's work in the maintenance branch. Both plaintiffs appeared on the "best qualified" list. Shortly before the selection Ignatowski and White rated Milburn's ability to work with others "superior" and his ability to plan and organize work "highly acceptable." Nothing in the record gives a decisive impression about any of the three candidates' abilities to plan and organize work or to work with others. Accordingly, defendant's assertion that these factors differentiated Bryant from plaintiffs enough to justify his selection cannot be credited.

The principal additional explanation defendant offered at trial for the selection of Bryant is his purportedly superior "breadth of experience." None of defendant's agents

actually stated this explanation, but defense counsel explained at trial that the concept encompasses the variety of Bryant's past jobs, which Ignatowski and White testified impressed them, as opposed to what defendant characterizes as Milburn's and Walker's narrower ranges of experience. Primarily, Bryant had a substantial military career, including extensive time spent overseas, followed by unexceptional civilian employment. Bryant's military experience included the supervision of foreign nationals and the inspector general's review in Italy that impressed Ignatowski and White. Ignatowski and White failed to explain, however, how these experiences demonstrated abilities or qualities that set Bryant's qualifications apart from plaintiffs'. Moreover, Bryant spent a significant portion of his military career in electrical trades and clerical work, areas irrelevant to the position at issue here. Plaintiffs' employment histories, at the Aqueduct and before, appear no less "broad" in terms of the range of tasks they performed, and they carry significantly more relevance for the job of maintenance general foreman of the utility section of the Aqueduct Division.

Besides the weakness of defendant's "breadth" argument on its own terms, the facts of this case render it inapposite. The announcement of the maintenance general foreman vacancy listed three particular jobs that exemplified the utility section's work. One of those jobs was pipefitter, the position that Walker held and Milburn supervised. In addition, plaintiffs have demonstrated that the Aqueduct Division follows an unwritten policy of promoting employees from within the Aqueduct Division in general and from within each branch in particular. One of the criteria listed in the vacancy announcement was "knowledge of different, *relevant* lines of work" (emphasis added). These facts are inconsistent with an emphasis on "breadth" in hiring and promotion, if "breadth" refers, as defendant implies it does, to experience outside the Aqueduct and unrelated to its functions.

In addition, defendant's emphasis on "breadth" implausibly deemphasizes what might be labelled "depth"—namely, the far greater basis that Ignatowski's and White's experience supervision of plaintiffs gave them for assessing the quality of plaintiffs' work than their perusal of Bryant's resume gave them for assessing his work. Both Ignatowski and White had repeatedly praised Milburn's achievement and ability, including supervisory ability, under their direct supervision. Breadth of experience is a fair consideration in an employment decision. But the function and context of the Aqueduct, and the facts surrounding the selection decision in this case, compel the conclusion that breadth could not legitimately have been the decisive rationale for the selection of Bryant that defendant claims it was.

Beyond the deficiencies in defendant's proffered explanations for the selection, pretext in those explanations is suggested by Ignatowski's questionable handling and use of the personnel specialist's ratings of the candidates and of the spreadsheet on which he copied those ratings. Baltimore District policy forbade Ignatowski, as the selecting official, from seeing the personnel ratings, which showed Milburn closely ranked with Bryant. After seeing the ratings, Ignatowski wrote them by hand onto the spreadsheet he had designed to guide his decisionmaking process. He also wrote, in red, that Milburn was experienced in the nonelectrical aspects of the Aqueduct's operations. Electrical operations are largely irrelevant to the work of the maintenance branch, but that is the area of the Aqueduct's work to which Bryant's past experience was most relevant. Ignatowski conceded at trial that Milburn was more qualified than Bryant as to the Aqueduct's nonelectrical operations. Ignatowski failed to produce the spreadsheet in discovery until the eleventh hour of this litigation. The document strongly suggests that Ignatowski was aware of the strength of Milburn's qualifications and sought to rationalize undervaluation of them.

The record contains numerous examples of plaintiffs' advantages over Bryant that Ignatowski appears to have disregarded. Plaintiffs had significantly greater experience than Bryant at the Aqueduct. Milburn's service, based on his reviews and awards, was exemplary, and nothing in the record suggests any deficiency in Walker's work.

Plaintiffs both worked in the branch and the section in which the vacancy occurred, giving them experience and insights regarding the people, tasks, and materials for which the maintenance general foreman would be responsible. In Milburn's case, this advantage had the added heft of supervisory experience.

■ Evidence of plaintiffs' qualifications for the position demonstrates that defendant's stated reasons for promoting Bryant were a pretext for racial discrimination. The record contains somewhat more evidence of Milburn's qualifications than of Bryant's. However, "[t]he issue in a case of an allegedly discriminatory failure to hire or promote is not the objective superiority or inferiority of the plaintiff's qualifications, but rather whether the defendant's selection criteria— be they wise or foolish—are *nondiscriminatory*." *Mitchell v. Baldridge*, 759 F.2d 80, 85 n. 3 (D.C.Cir.1985), *citing Burdine*, 450 U.S. at 258–59, 101 S.Ct. at 1096. Thus, the fact that evidence of Milburn's qualifications contributes more than does evidence of Walker's to a conclusion that Bryant was promoted for racially discriminatory reasons is irrelevant to the ultimate issue of discrimination. The sum of the evidence supports the conclusion that both plaintiffs were victims of racial discrimination veiled by pretextual explanations.

■ The inference of discrimination gains force because of the evidence of a discriminatory environment at the Aqueduct. *Cf. Parker v. Secretary, United States Department of Housing and Urban Development*, 891 F.2d 316, 322 (D.C.Cir.1989). Most prominently, Aqueduct Division officials appear not to honor the directives of the Baltimore District's affirmative action program. The District's equal employment opportunity officer appears to rubber-stamp the Aqueduct Division's promotion decisions, having never challenged one in twenty years on the job. The Aqueduct Division has had a negligible number of African American supervisors, including only one upper-level supervisor, despite its high percentage of African American employees. Minority promotion goals go unmet. Officials appear to avoid the dictates of the affirmative action policy by restrictively interpreting the requirement of rough equali-

ty for bringing the policy into play. In addition, plaintiffs' expert testified that African Americans receive a disproportionately small number of "noncompetitive" promotions at the Aqueduct. Defendant's failure to comply with its own equal employment obligations cannot form a basis for Title VII liability. *E.g., Liao v. TVA*, 867 F.2d 1366, 1369 (11th Cir.1989). However, noncompliance can serve as evidence of defendant's intent. *E.g., Mozee v. American Commercial Marine Serv. Co.*, 940 F.2d 1036, 1051 (7th Cir.1991). Defendant's failure to comply with its own affirmative action program supports an inference of discriminatory intent.

As discussed above, plaintiffs have made out a successful prima facie case of racial discrimination. Based on the deficiencies in the legitimate, nondiscriminatory reasons offered by defendant to justify its nonselection of plaintiffs, as enhanced by the other evidence of pretext in the record and by the negative climate of race relations at the Aqueduct, I conclude that defendant's proffered reasons constitute a pretext for racial discrimination. Accordingly, I conclude that defendant intentionally discriminated against plaintiffs in selecting Paul Bryant for the position of maintenance general foreman in December 1988, in violation of Title VII of the Civil Rights Act of 1964.

### B. *Milburn's Retaliation Claims*

■ In order to make out a prima facie case of retaliation under Title VII, a plaintiff must show that (1) he engaged in protected activity; (2) the defendant took an adverse personnel action against him; and (3) the adverse action was causally related to his exercise of protected rights. *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1423 (D.C.Cir.1988). If plaintiff makes out a prima facie case, defendant may introduce evidence of legitimate, nonretaliatory reasons for the challenged conduct, and plaintiff may then attempt to show that defendant's proffered reasons are pretextual. *Id.*

■ Plaintiff Milburn claims retaliation based on Bryant's Memorandum for the Record regarding the August 1990 lime machine

incident and on his 1990 civilian performance rating. Milburn has failed to make out a prima facie case as to either claim. Milburn engaged in protected activity by filing his complaints before the EEOC and his lawsuit regarding the maintenance general foreman selection. The record contains no evidence that either of defendant's allegedly retaliatory acts was causally linked to Milburn's protected activity. The only evidence of causation plaintiff purports to offer is the fact that the alleged retaliation occurred after Milburn engaged in some of his protected activity. Mere coincidence in time does not establish causation. *E.g., Collins v. Illinois,* 830 F.2d 692, 704 (7th Cir.1987).

■ In addition, Milburn has failed to show that the acts complained of were ultimately adverse to him. Bryant's Memorandum resulted in no disciplinary action or other demonstrably adverse employment consequence. The fact that Milburn's 1990 performance rating was not higher than it was may or may not have diminished Milburn's performance bonus in 1991, depending on availability of funds and the discretion of Milburn's supervisor. By the same token, the fact that the rating was not lower may or may not have increased Milburn's bonus. Milburn's 1990 performance rating was roughly consistent with his 1988, 1989, and 1991 ratings. Marginal distinctions with uncertain consequences are not "adverse action" for the purposes of Title VII. *See, e.g., Pinar v. Dole,* 747 F.2d 899, 912 (4th Cir. 1984), *cert. denied,* 471 U.S. 1016, 105 S.Ct. 2019, 85 L.Ed.2d 301 (1985).

## C. The Remedy

■ Title VII confers broad power to grant appropriate relief, "which may include, but is not limited to, reinstatement or hiring of employees, with or without back pay ... or any other equitable relief as the court deems appropriate." 42 U.S.C. § 2000e–5(g); *see also* 42 U.S.C. § 2000e–16(d). The scope of possible relief "is determined by the purposes of the Act." *International Brotherhood of Teamsters v. United States,* 431 U.S. 324, 364, 97 S.Ct. 1843, 1869, 52 L.Ed.2d 396 (1977). One such purpose is "to make persons whole for injuries suffered on account of unlawful employment discrimination." *Albermarle Paper Co. v. Moody,* 422 U.S. 405, 418, 95 S.Ct. 2362, 2372, 45 L.Ed.2d 280 (1975). The Court has "not merely the power but the duty to render a decree which will so far as possible eliminate the discriminatory effects of the past as well as bar like discrimination in the future." *Id.* at 418, 95 S.Ct. at 2372.

■ Compensatory damages were not available in Title VII actions prior to the adoption of the 1991 Civil Rights Act's amendments to the statute. *E.g., Boddy v. Dean,* 821 F.2d 346, 352 (6th Cir.1987). Section 102 of that Act provides that a Title VII plaintiff "may recover compensatory and punitive damages ... from the respondent." Pub.L. 102–166, 105 Stat. 1071. The Supreme Court recently determined that section 102 does not apply retroactively to cases, such as these, that were pending at the time the amendments became law. *Landgraf v. USI Film Products,* — U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). Therefore, compensatory damages are not a remedial option here.

■ Absent the possibility of a damage remedy, the most appropriate relief for a plaintiff in the circumstances of this case is backpay for the difference between the plaintiff's compensation in his actual positions at the Aqueduct and the compensation he would have received had he been promoted to the position of maintenance general foreman, together with a variation on the Title VII "reinstatement" remedy. *See* 42 U.S.C. § 2000e–5(g). Backpay usually is a component of appropriate relief in a Title VII case involving a failure to hire or promote. *Albermarle Paper,* 422 U.S. at 415–16, 95 S.Ct. at 2370–71. The functional equivalent of reinstatement in these circumstances is to place the plaintiff in the position—maintenance general foreman of the utility section—that he was unlawfully denied.

This approach presents two obvious, but surmountable, problems. First, the maintenance general foreman position at issue is currently occupied by Paul Bryant. Bryant bears no responsibility for the promotion decision from which he benefited at plaintiffs'

expense. The Court of Appeals for this Circuit has determined that, in providing for a reinstatement remedy in Title VII, "there is no evidence that Congress intended to exclude bumping [of employees hired or promoted in violation of the statute] from the district court's arsenal of available alternatives." *Lander v. Lujan,* 888 F.2d 153, 156 (D.C.Cir.1989). The *Lander* Court approved even the displacement of innocent employees, denying that "the innocent beneficiary has a superior equitable claim to the job vis-a-vis the victim of discrimination." *Id.* at 157. In this case, however, the difficult balancing of equities required by the bumping remedy need not be undertaken. Aqueduct Chief Costas has testified to his authority to create new units and name supervisors for those units. Bryant currently oversees seven units, significantly more than Chirichella—the other section chief in the maintenance branch—or any other section chief at the Aqueduct. Therefore, to effectuate Title VII's purpose of making plaintiffs whole, defendant will be directed to divide the utility section into two sections, one with four units and one with three, creating a new maintenance general foreman position to supervise the new section.

The second remedial problem is that there are two prevailing plaintiffs in this case, both of whom were wrongfully denied the same promotion. Obviously, had defendant filled the position in a lawful manner, only one of the plaintiffs could have, and would have, received the promotion. The EEOC dealt with a similar situation by remanding the case to the defendant agency for a choice between the two plaintiffs, a choice the Court of Appeals for the Fourth Circuit eventually affirmed. *See Pollard v. Grinstead,* 741 F.2d 73, 75 (4th Cir.1984). In this case, where the record contains voluminous evidence of the candidates' qualifications, including the opportunity to observe both men during extensive live testimony, a judicial determination is possible and preferable.

Based on all the facts in evidence, I conclude that Milburn was significantly more qualified to be maintenance general foreman than was Walker. Milburn had more experience at the Aqueduct in a position of greater

authority, and his application reflected substantial awards and commendations from his superiors. In addition, Milburn remains employed at the Aqueduct in the position he held at the time of the events at issue. The weight of the evidence supports the determination that Milburn is entitled to relief in the form of backpay and promotion. In the absence of discrimination, Milburn, and not Walker, would have been promoted. In light of Milburn's superior qualifications, Walker, who left the Aqueduct in 1991, has failed to prove his entitlement either to a promotion or to backpay. Congress has provided no damage remedy for discrimination committed before 1991. *See Landgraf, supra.* Accordingly, the accompanying Order dismisses Walker's Complaint for failure to prove a claim on which he is entitled to relief.

### *ORDER*

For the reasons stated in the accompanying Memorandum, it is this 15th day of June, 1994, hereby

ORDERED: that judgment should be, and is hereby, entered for plaintiff Milburn in Case No. 90–1947; and it is further

DECLARED AND ORDERED: that, while defendant has discriminated against Walker, his complaint in Case No. 90–2443 should be, and is hereby, DISMISSED for failure to prove a claim on which relief can be granted; and it is further

ORDERED: that judgment should be, and is hereby, entered for defendant in Case No. 91–2216 and in Case No. 92–0207; and it is further

ORDERED: that defendant shall, as soon as practicable, divide the current utility, repair, and installation section of the maintenance branch in the Washington Aqueduct Division into two sections of four and three units and shall install plaintiff Milburn in the position of maintenance general foreman for one of those sections; and it is further

ORDERED: that defendant shall pay to plaintiff Milburn backpay in the amount of the difference between the compensation paid to him and the compensation he would have earned as maintenance general foreman of the utility, repair, and installation section

between the date that Paul Bryant became maintenance general foreman and the date Milburn is promoted to the new maintenance general foreman position.