Milford S. JONES, Plaintiff,

v.

John E. POTTER, Post Master General, United States Postal Service, Defendant.

No. CIV.A. 01–1905(RBW).

United States District Court, District of Columbia.

Jan. 22, 2004.

Martin P. Hogan, Gromfine & Taylor, P.C., Alexandria, VA, for Plaintiff.

Benton Peterson, Oliver W. McDaniel, U.S. Attorney's Office for the District of Columbia, Meredith Manning, Hogan & Hartson, L.L.P., Washington, DC, for Defendant.

## MEMORANDUM OPINION

WALTON, District Judge.

This lawsuit involves claims of sexual harassment and retaliation. The defendant has filed a motion for summary judgment regarding plaintiff's claims. The Court will grant this motion for the reasons set forth below.

**4**

## I. Factual Background

The facts pertaining to this case are relatively straightforward. At the time the events pertinent to this matter occurred, plaintiff, Milford Jones, was employed by the defendant, the United States Postal Service, as a material handler, Grade Level PS–4, at the Brentwood postal facility located in the District of Columbia. Complaint filed on September 10, 2001 ("Compl.") ¶ 9.[1] On October 23, 2000, plaintiff was working in the Brentwood facility's stock room, talking to several co-workers, when James Wallace, the stock room manager, allegedly "sexual[ly] assault[ed]" plaintiff. *Id.* ¶ 11. Specifically, plaintiff alleges that Mr. Wallace

came up behind [him], grabbed his arms, pulled Mr. Jones toward him, and rubbed his penis against Mr. Jones' buttocks. Mr. Jones pulled away from Supervisor Wallace, but before Mr. Jones could turn around, Supervisor Wallace pulled Mr. Jones back toward him, and rubbed his penis against Mr. Jones' buttocks again. Mr. Jones broke away from Supervisor Wallace's grip and got away from him.

*Id.*[2] Plaintiff states that this incident occurred in full view of his co-workers and the incident was "non-consensual, and extremely humiliating and embarrassing." *Id.* Plaintiff states that Mr. Wallace is a homosexual,[3] while he is a heterosexual

1. According to his deposition testimony, plaintiff still remains employed with the Postal Service. Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n"), Exhibit ("Ex.") 21, Deposition of Milford Jones dated March 18, 2003 ("Jones' Dep.") at 4. Plaintiff began working in the stockroom at the Brentwood facility in 1995. *Id.* at 16. Mr. Wallace became plaintiff's manager in approximately 1998. *Id.* at 18. Previously, plaintiff served in the United States Marines from 1971 through 1973. *Id.* at 17.

2. There being two sides to every story, Mr. Wallace's version of the events of October 23 are slightly different from the plaintiff's. He testified during his deposition that another employee, Mr. LaPaul Newell, had gone into Mr. Wallace's office and the plaintiff allegedly made a gesture towards his nose, indicating that Mr. Newell was "brown-nosing" the boss. Defendant's Motion for Summary Judgment, ("Def.'s Mot.") Exhibit ("Ex.") G, Deposition of James E. Wallace dated December 12, 2002 ("Wallace Dep.") at 66. At that point, Mr. Wallace, purportedly in a joking manner, walked over to the plaintiff, "grabbed [the plaintiff's] coat sleeves, his arms, and [said to the co-worker,] 'Newell, get him. You don't have to take that.'" *Id.* While Mr. Wallace acknowledges that he "might have bumped up against [the plaintiff,]" because the plaintiff "is a pretty large fellow[,]" *id.* at 68, he contends that all the actions were taken in a joking manner by the

plaintiff who, according to Mr. Wallace, commented to his coworker, "'Newell, you're lucky, because if he didn't have my hand, I'd have whipped the both of you all.'" *Id.* Furthermore, Mr. Wallace stated that after the incident, the plaintiff "laughed and then went on and clocked out and went home." *Id.* at 69. Plaintiff does admit he may have teased Mr. Newell before Mr. Newell went into Mr. Wallace's office about going to "brown-nose" Mr. Wallace and rubbed his nose as Newell walked into Mr. Wallace's office. Def.'s Mot., Ex. A, Jones Dep. at 57–58. Mr. Wallace's version of the incident is not inconsistent with the versions given by plaintiff's co-workers who were present when the incident occurred. *See, e.g.,* Def.'s Mot., Ex. B, Deposition of Cheryl Curry dated March 26, 2003 ("Curry Dep.") at 17 (stating that she felt that the incident was inappropriate "[b]ecause there was too much horseplay . . . ." and because Mr. Wallace was too close to the plaintiff); Ex. C, Deposition of Ada Sherrill dated March 26, 2003 ("Sherrill Dep.") at 30 (indicating that the incident was "horseplay"); Ex. D, Deposition of Valeria Carter dated March 26, 2003 ("Carter Dep.") at 20–21 (stating that she heard "loud laughing or whatever," and when she got up, she saw Mr. Wallace holding the plaintiff's arms behind his back and she just returned to her desk.).

3. It appears that while Mr. Wallace has admitted to having prior "intimate sexual contact" with men, Plaintiff's Opposition to De-

and married. *Id.*

On the same day as the incident occurred, plaintiff filed a charge of discrimination with the Postal Service's Equal Employment Opportunity ("EEO") office. *Id.* ¶ 12. Plaintiff alleges that after he filed his charge of discrimination, the "[d]efendant embarked on a campaign of retaliation against [him]." *Id.* ¶ 13. This "campaign of retaliation" allegedly included

> harassing [plaintiff] on a daily basis; the elimination of his cubicle work area; denying [plaintiff] the opportunity to work overtime hours which he frequently worked prior to the initiation of EEO proceedings[,] thus[ ] reducing [p]laintiff's work hours and thereby causing him to lose overtime compensation; etc.

*Id.* ¶ 13. Based on the above allegations, plaintiff filed his two-count complaint in this Court alleging sexual harassment and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* (2000). He seeks $300,000 in compensatory and punitive damages; a permanent injunction prohibiting the defendant from future sexual harassment or retaliation; Mr. Wallace's dismissal, transfer or reassignment to ensure that plaintiff never works with Mr. Wallace again;[4] a letter from defendant apologizing for the sexual harassment and retaliatory actions; any overtime compensation plaintiff may have obtained but for the defendant's retaliatory conduct; the re-establishment of plaintiff's cubicle work station, medical expenses, and the costs of bringing this action.

## II. Analysis

### A. Standard of Review

As already indicated, this matter is currently before the Court on defendant's motion for summary judgment. Federal Rule of Civil Procedure 56 provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving

---

fendant's Motion for Summary Judgment ("Pl.'s Opp'n"), Exhibit ("Ex.") 22, Excerpts from the Deposition of James E. Wallace ("Wallace Dep.") at 77, he also testified that he had a girlfriend during 2000. Def.'s Mot., Ex. G, Wallace Dep. at 64. Defendant argues that "[p]laintiff's assertion that [Mr.] Wallace conceded he has had intimate sexual relations with men is an improper characterization of [Mr.] Wallace's testimony[,]" Defendant's Reply to Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Def.'s Reply") at 5, however, defendant fails to address Mr. Wallace's statements made on page 77 of his deposition, wherein the following exchange occurred:

> Q. Okay. When you say in response to the two questions that I just gave you, you say you might have bumped into somebody, do you understand that my question refers to intimate sexual contact with a man prior to October 23, 2000?
> A. Yes, I understand your question.
> Q. Okay. And is that your answer, you may have bumped into somebody?
> A. Yes, that is my answer.
> Q. All right. That's your same answer to the question [regarding] having homosexual contact with men prior to October 23, 2000?
> A. That is my same answer.

Pl.'s Opp'n, Ex. 22, Wallace Dep. at 77. Thus, at a minimum, Mr. Wallace's testimony could be construed to support the position that he has previously engaged in homosexual activities, although it does not definitely support the plaintiff's conclusion that he is currently a practicing homosexual.

4. Since April 2001, Mr. Wallace has been working at the defendant's Tulsa, Oklahoma location. Pl.'s Opp'n, Ex. 22, Wallace Dep. at 11–12. This transfer was the result of a promotion Mr. Wallace applied for in January or February of 2001. *Id.* at 12.

party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge . . . ." *Id.* at 255, 106 S.Ct. 2505. The entry of summary judgment is appropriate after there has been an "adequate time for discovery . . . [and the] party [against whom the motion has been filed] fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). When reviewing the evidence, the Court must draw "all inferences . . . in favor of the nonmoving party[.]" *Coward v. ADT Security Systems, Inc.,* 194 F.3d 155, 158 (D.C.Cir.1999); *Aka v. Washington Hosp. Center,* 156 F.3d 1284, 1295 (D.C.Cir.1998).

## B. Plaintiff's Sexual Harassment Claim

The October 23 incident comprises the sole incident [5] of sexually harassing behavior that plaintiff alleges in his complaint.[6] Defendant advances two arguments regarding why summary judgment should be entered in its favor on this count of the complaint. First, defendant argues that the plaintiff cannot demonstrate that the alleged sexual harassment was "motivated by Mr. Wallace's sexual desire." Defendant's Memorandum in Support of Defendant's Motion for Summary Judgment ("Def.'s Mem.") at 10. Rather, defendant

argues, "Mr. Wallace's actions were in the nature of horseplay." *Id.* at 11. Second, the defendant argues that plaintiff cannot demonstrate "that the alleged conduct was sufficiently severe or persuasive to create an objectively hostile or abusive work environment that altered the conditions of [plaintiff's] employment." *Id.* at 13. In opposition, plaintiff argues that his claim is sufficient to withstand summary judgment because this one incident was clearly based on sex, and was so "outrageous, offensive, unwelcome, and egregious" that the event, standing alone, constitutes a violation of Title VII. Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp'n") at 23. Alternatively, plaintiff argues that he has presented sufficient facts and evidence from which this Court can conclude that he was the victim of a hostile working environment. *Id.* at 24.

■ In *Oncale v. Sundowner Offshore Services Inc.,* 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998), the Supreme Court acknowledged "that sex discrimination consisting of same-sex harassment is actionable under Title VII . . . ." In this acknowledgment, the Court was careful to emphasize that claims of same-sex harassment remain subject to the identical requirements as claims of opposite-sex harassment; namely, a plaintiff making either type of sexual harassment claim "must always prove that the conduct at issue . . . actually constituted 'discrimina[tion] . . . because of . . . sex.' " *Id.* at 81, 118 S.Ct. 998. Thus, to establish his claim of "same-sex harassment, [the] court[ ] first must determine whether the harasser's conduct constitutes sex discrim-

---

**5.** Although plaintiff repeatedly refers to Mr. Wallace's act of grabbing him as occurring "on at least two occasions," Pl.'s Opp'n at 25, the facts demonstrate that Mr. Wallace grabbed him on one occasion, October 23, 2000, although, according to plaintiff, he "grabbed [the plaintiff] from behind twice . . . ." *Id.* at 9.

**6.** In his opposition to the defendant's motion for summary judgment, and in his deposition testimony, plaintiff refers to various actions taken on the part of Mr. Wallace that made plaintiff "uncomfortable." These acts will be discussed later, *infra* at 8–9.

ination." *La Day v. Catalyst Technology, Inc.*, 302 F.3d 474, 478 (5th Cir.2002). If this determination is answered in the affirmative,

> the court must decide whether the challenged conduct meets the applicable standards for either a *quid pro quo*[7] or hostile environment claim. For example, same-sex harassment that is 'severe or pervasive' enough to create a hostile environment ... might be excluded from the coverage of [T]itle VII because it was not discriminatory on the basis of sex. On the other hand, same-sex harassment that is indisputably discriminatory might not be serious enough to make out either a *quid pro quo* or hostile environment claim.

*Id.* (citation omitted). *See, e.g., Davis v. Coastal Int'l Security, Inc.*, 275 F.3d 1119, 1126 (D.C.Cir.2002) (holding that actions of plaintiff's co-workers, which included slashing plaintiff's tires, grabbing their crotches and making kissing gestures, and uttering a phrase used to describe oral sex, "however vulgar ... [did not] constitute[ ] discrimination because of sex.").

The Court's first task is to determine whether Mr. Wallace's action was taken because of plaintiff's sex. The *Oncale* decision "suggested three ways to prove that same-sex sexual behavior rises to the level of illegal harassment[.]" *Davis*, 275 F.3d at 1123. The first method requires a showing "that the sexual behavior is motivated by actual homosexual desire[.]" *Id.*

The second method of demonstrating same-sex harassment requires a showing "that the harassment is framed in 'such sex-specific and derogatory terms ... as to make it clear that the harasser is motivated by general hostility' towards members of the same gender in the workplace[.]" *Id.* (citing *Oncale*, 523 U.S. at 80, 118 S.Ct. 998). Third, the plaintiff may demonstrate "that there is 'direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Id.* (quoting *Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998).

Plaintiff appears to rely on the first method of proof, because he asserts that "there is ample evidence to support a finding that Manager Wallace was homosexual and/or bisexual, and independently, his conduct was motivated by sexual desire." Pl.'s Opp'n at 21. Plaintiff argues that "[t]he conduct itself was because of sex." *Id.* at 20. This is so because, according to plaintiff's version of the events, "[w]hen a person grabs you and rubs his body ... [,]his penis against you, you know what he—[you] know what his intentions are." *Id.*, Ex. 21, Deposition of Milford Jones dated March 18, 2003 ("Jones' Dep.") at 91. Plaintiff testified during his deposition that he knows Mr. Wallace is gay because he is "[a] lot on the feminine side[,]" and because of "little actions" taken by Mr. Wallace, such as "how he walks, and things he said, like, sister girl ...." *Id.*, Ex. 21, Jones' Dep. at 24.[8] Plaintiff also testified

---

**7.** *"Quid pro quo"* discrimination cases are those involving " 'tangible employment action' that 'resulted from [the employee's] acceptance or rejection of his supervisor's alleged sexual harassment." *La Day*, 302 F.3d at 481 (citation omitted). A plaintiff may establish a *quid pro quo* claim in lieu of a hostile working environment claim because "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms

and conditions of employment that is actionable under Title VII." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998).

**8.** Plaintiff also testified that when he was working on the weekend, Mr. Wallace has brought friends to the job, and, according to Mr. Jones, he "just kn[e]w that they were ... gay." Def.'s Mot., Ex. A, Jones Dep. at 25. In addition, plaintiff states that when a female co-worker would pretend to perform oral sex on a hot dog, Mr. Wallace would tell her to

that there were several things Mr. Wallace did that made plaintiff "uncomfortable," for example, when Mr. Wallace asked for a picture of plaintiff in his Marine uniform; the one occasion when Mr. Wallace invited plaintiff to spend the night at his house if he got snowed in because it was snowing at the time; the several occasions when Mr. Wallace invited plaintiff to take walks with him to see the air handlers; the ten or so occasions when Mr. Wallace walked past plaintiff and brushed his chest on plaintiff's back; and previously inviting plaintiff to sit in his office "to talk about ... the ladies in [their] stock room[,]" *id.* at 26–31, 38.[9]

■ The problem with plaintiff's evidence is that it fails to conclusively establish that Mr. Wallace explicitly made sexual advances to plaintiff or that Mr. Wallace is a homosexual or more importantly that he had that sexual preference when the event at issue occurred.[10] *Cf. La Day*, 302 F.3d at 480 (concluding that there was "credible evidence" that the plaintiff's supervisor was "a homosexual and that he was making sexual advances[,]" to the plaintiff based on the fact that he stated "that he was 'jealous' of [the plaintiff's] girlfriend, combined with his poking of [the plaintiff's] anus .... [and his] later hostility toward [the plaintiff], exemplified by his spitting tobacco at him, [which the

court noted could] plausibly ... be interpreted as anger over [the plaintiff's] rejection of his sexual advances." In addition, the court noted that other employees claimed the supervisor made "sexual advances" to them).[11] In fact, the claim that Mr. Wallace is a homosexual is solely based on plaintiff's subjective beliefs.[12] However, without affirmatively concluding that plaintiff has satisfied the "because of sex" requirement of his claim, interpreting the facts in a light most favorable to plaintiff as the non-moving party, *see Coward*, 194 F.3d at 158, the Court concludes that there is a genuine issue of material fact as to whether or not Mr. Wallace is a homosexual and whether or not the conduct occurred because of plaintiff's gender. *See La Day*, 302 F.3d at 478 (stating a plaintiff can demonstrate sexual harassment if he "show[s] that the alleged harasser made 'explicit or implicit proposals of sexual activity' and [can] provide 'credible evidence that the harasser was homosexual.'"). Mr. Wallace acknowledged during his deposition testimony that he had sexual relations with men before, and accepting plaintiff's version of the events as true, Mr. Wallace's act of rubbing his penis against the plaintiff's buttocks could be viewed by a fact-finder as objectively explicit sexual activity. *See id.* at 481 (stating that plaintiff's supervisor's action in touching the

"[g]o ahead, sister girl ...[,]" which made plaintiff know that he was gay. *Id.* at 51.

9. Plaintiff testified that if any man, homosexual or heterosexual, had done the things Mr. Wallace did (such as asking to see his picture and taking him for walks in the air handling room), he would have felt uncomfortable and "would have had to wonder about [the person]." Def.'s Mot., Ex. A, Jones Dep. at 28.

10. Even the testimony Mr. Wallace gave at his deposition fails to affirmatively support a conclusion that Mr. Wallace is currently a homosexual or was at the time of the incident at issue. *See supra* at 4–5 n. 3.

11. According to plaintiff, Mr. Wallace made a sexual proposition to a co-worker of plaintiff's, Tyrone Cunningham. Def.'s Mot., Ex. A, Jones Dep. at 40–41. However, this fact is based on a hearsay statement that was allegedly made to plaintiff by the co-worker. *Id.*

12. Plaintiff testified that he is a Christian man and therefore, in his view homosexuality is a sin, and it makes him "[r]eal uncomfortable." Pl.'s Opp'n, Ex. 22, Jones' Dep. at 26. However, he testified he was able to work with Mr. Wallace when Mr. Wallace first came to his department and he did not "go out and ask for a transfer because [Mr. Wallace] was gay." *Id.*

plaintiff's anus "constituted 'explicit or implicit proposals of sexual activity.' ") (quoting *Oncale*, 523 U.S. at 80, 118 S.Ct. 998).

■ "Once sex discrimination has been proven sufficiently to survive summary judgment ... there is no distinction between same-sex and opposite-sex harassment with respect to the next stage of the inquiry: determining whether the discriminatory action was serious enough to constitute *quid pro quo* or hostile environment harassment." *La Day*, 302 F.3d at 481. Because plaintiff has not presented any evidence from which a reasonable jury could find *quid pro quo* discrimination,[13] he must establish that there is a genuine issue of material fact as to whether he was subject to a hostile working environment. This he has failed to do.

■ The Supreme Court has clearly held that " '[c]onduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.' " *Oncale*, 523 U.S. at 81, 118 S.Ct. 998 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). Thus, the behavior must be severe in order "to ensure that courts and juries do not mistake ordinary socializing in the workplace—such as male-on-male horseplay or intersexual flirtation—for discriminatory 'conditions of employment.' " *Id.* In determining whether the behavior was objectively offensive, the Court must judge the behavior "from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.' " *Id.* (quoting *Harris*, 510 U.S.

at 23, 114 S.Ct. 367). In this same-sex case, "(as in all) harassment cases, that inquiry requires careful consideration of the social context in which particular behavior occurs and is experienced by its target." *Id.* This is so because "[t]he real social impact of workplace behavior often depends on a constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." *Id.* at 82, 118 S.Ct. 998. As an example, the Supreme Court noted that while a "football player's working environment [would not be considered] severely or pervasively abusive, for example, if the coach smacks him on the buttocks as he heads onto the field ... the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office." *Id.* at 81. With these concepts in mind, the Court has objectively, from a reasonable fact-finder's perspective, evaluated the behavior alleged by plaintiff and concludes that Mr. Wallace's behavior, standing alone, was not violative of Title VII, as it was not so severe or pervasive as to constitute a hostile working environment.

First, it is clear that this one incident was not pervasive; it happened on one occasion and was not repeated. Although plaintiff asserts that Mr. Wallace engaged in prior behavior that made plaintiff feel "[r]eal uncomfortable[,]" Pl.'s Opp'n, Ex. 21, Jones' Dep. at 26, such as asking plaintiff for a picture of him in his Marine uniform; inviting plaintiff on one occasion to spend the night at his house if plaintiff got snowed in because it was snowing; inviting plaintiff on walks to see the air handlers; walking past plaintiff and brushing his chest past plaintiff's back, and in-

---

**13.** Plaintiff has failed to present any evidence that Mr. Wallace ever made threats regarding denying him tangible employment benefits if plaintiff failed to comply with any demands or

granting such benefits if he agreed to Wallace's overtures. *See Ellerth*, 524 U.S. at 753–54, 118 S.Ct. 2257.

viting plaintiff to sit in his office "to talk about ... the ladies in [their] stock room[,]" *id.* at 26–31, 38, 114 S.Ct. 367, plaintiff admitted that he, and his co-workers, laughed at Mr. Wallace's behavior. *Id.* at 32–33, 114 S.Ct. 367. The atmosphere prior the incident was not oppressive; indeed, plaintiff's co-workers teasingly referred to plaintiff as Mr. Wallace's "boy" because they perceived that Mr. Wallace favored plaintiff and was more likely to grant any request the plaintiff made over their requests. *Id.* at 33–34, 114 S.Ct. 367. One of plaintiff's co-workers, Ada Sherrill, testified that plaintiff and Mr. Wallace had a very good relationship and when Mr. Wallace's car was broken into, he called on Mr. Jones to come and pick him up and plaintiff "rode him around a lot." Def.'s Mot., Ex. C, Deposition of Ada Sherrill dated March 26, 2003 ("Sherrill Dep.") at 14.[14] Plaintiff himself testified that his relationship with Mr. Wallace "might have made [his co-workers] a little jealous." Pl.'s Opp'n, Ex. 21, Jones' Dep. at 34. Furthermore, once the incident occurred, Mr. Wallace was promptly removed from the Brentwood facility. *Id.* at 98. Although Mr. Wallace eventually returned to Brentwood after an investigation was conducted and a determination was made that the incident was "in the nature of horseplay ... [,]" Def.'s Mot.,

Ex. H, Declaration of Louis I. Higginbotham, Manager, Maintenance, dated June 27, 2003, ¶ 4, it is also undisputed that plaintiff was transferred to another department so he did not have to work directly for Mr. Wallace. In light of this evidence, the Court is unable to conclude that the allegedly harassing behavior was so pervasive as to alter plaintiff's working conditions.

■ Nor can the Court conclude that this one incident was so severe as to alter plaintiff's working conditions. Plaintiff's deposition testimony and other evidence in the record indicates that his working environment prior to this incident was generally amicable. *See* Def.'s Mot., Ex. A, Jones Dep. at 52 (stating that the employees in his department "all socialize together ... like, eat[ing] lunch together ... [and] talk[ing]. Sometimes somebody [would] tell a joke or something."); 58 (testifying that he and Mr. Newell "would tease each other all day. That would make our day go by."); *see also id.* at 46 (agreeing that his subsequent supervisor, Ms. Gaskins was "a harsher supervisor than Mr. Wallace ...."); Ex. B, Curry Dep. at 33 (stating that prior to the incident, the working atmosphere was "relaxed ...."). Nonetheless, plaintiff argues that this one incident was so severe that it alone establishes that he was subjected to a hostile work environment.[15] The Court cannot agree with this assessment.[16] First, it is undis-

---

14. This statement is corroborated by a declaration of Mr. Jones, wherein he stated that Mr. Wallace called him early on the morning of October 23, 2000, the date of the incident about which plaintiff complains, and asked *plaintiff to pick him up from his home.* Def.'s Mot., Ex. A, Jones Dep., Ex. 3 (Declaration of Mildred Jones dated December 8, 2000).

15. The Equal Employment Opportunity Commission ("EEOC") agreed with plaintiff, concluding that this one incident was "sufficiently egregious ... to state a claim." Pl.'s Opp'n, Ex. 17 (Decision of the EEOC dated June 13, 2001).

16. Plaintiff compares his situation to that of the plaintiff in *Ellerth,* and states that "it would be nonsensical ... and patently unfair for an employee, such as Ms. Ellerth, to be able to state a legally sufficient claim based upon unfulfilled threats of sexual misconduct by her supervisor, while Mr. Jones, who was the victim of fulfilled, offensive acts of sexual misconduct by his manager, could not establish a legally sufficient claim." Pl.'s Opp'n at 18–19. Plaintiff's reliance on *Ellerth,* however, is misplaced as there, the Supreme Court "accept[ed] the [d]istrict [c]ourt's finding that the alleged conduct was severe or pervasive." 524 U.S. at 754, 118 S.Ct. 2257. Indeed, the Court explicitly declined to address the issue

puted that the incident lasted a few seconds and after separating himself from Mr. Wallace, plaintiff clocked out of work because "it was [almost] time for [him] ... to go home." Def.'s Mot., Ex. A, Jones Dep. at 93. Second, it is also undisputed that Mr. Wallace's actions were performed in the plain view of several of plaintiff's co-workers, and Mr. Wallace jokingly called to Mr. Newell "to get" the plaintiff, Pl.'s Opp'n, Ex. 2, Statement by Cheryl Curry; Ex. 3, Statement by Valeria Carter, although plaintiff contends he did not remember what Mr. Wallace said to Mr. Newell. Def.'s Mot., Ex. A, Jones Dep. at 63. Plaintiff testified in his deposition that Mr. Newell made a motion as if he was coming to hit him but then walked away, although he also testified that if Mr. Wal-

lace told Mr. Newell "to hit ... or get" him, that was merely Mr. Wallace's "way of making it look like he was just playing with me." Id. at 78.[17] Plaintiff acknowledged in his deposition that he may have been laughing after this incident occurred, although he contends that any laughing was "mad and nervous laughter ... it wasn't happy laughter." Def.'s Mot., Ex. A, Jones Dep. at 142. Furthermore, Mr. Newell, the third participant in this event, "was laughing because [he] thought it was funny." Id. at 93. Given the circumstances in this case, the Court finds that a reasonable jury, at most, could conclude that while Mr. Wallace's actions may have been in bad taste, and personally offensive, they were not severe enough to constitute a hostile working environment.[18] See Lee-

---

of whether "a single unfulfilled threat is sufficient to constitute discrimination in the terms or conditions of employment[,]" because it noted that in Ellerth there had been "numerous alleged threats." Id.

17. Plaintiff's testimony at his deposition conflicts with the declaration he made "under penalty of perjury" on December 8, 2000. Def.'s Mot., Ex. A, Jones Dep., Ex. 3 (Declaration of Mildred Jones dated December 8, 2000). In his declaration, Mr. Jones stated that when Mr. Wallace was holding him, Mr. Wallace "told Mr. Newell to hit me, get me. Mr. Newell faked like he was going to hit me, *then we laughed and walked away.*" Id. (emphasis added). However, for purposes of this motion, the Court credits the plaintiff's testimony that he does not recall what Mr. Wallace said to Mr. Newell.

18. Even if plaintiff had been able to establish that this one incident was severe or pervasive, defendant could still demonstrate that it is entitled to summary judgment by establishing the affirmative defense
    (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer to avoid harm otherwise.

Ellerth, 524 U.S. at 764, 118 S.Ct. 2257. Although plaintiff contends that "a potential affirmative defense should not be determined at this point in the proceedings, but, rather, after trial[,]" such a finding is appropriate at the summary judgment stage. See La Day, 302 F.3d at 483 (noting employer could have obtained summary judgment if had established its affirmative defense). Furthermore, although the Court is not making a definitive finding on the merits of the defense, it is undisputed that the plaintiff failed to complain about Mr. Wallace's behavior prior to the October 23 incident. Plaintiff testified that he failed to do so because he never thought it would go as far as it did and he was afraid of losing his job. Jones Decl. ¶ 14. This does not alter the fact that if plaintiff felt uncomfortable because of Mr. Wallace's actions, he should have made these feelings known to Mr. Wallace's supervisor, Mr. Dushane, with whom he testified he never discussed Mr. Wallace's behavior because he "didn't think it would go as far as it went." Def.'s Mot., Ex. A, Jones Dep. at 49. Clearly, once plaintiff complained about Mr. Wallace's behavior, his complaint was promptly acted upon, as Mr. Wallace was removed from the Brentwood facility within a matter of days, and plaintiff was placed in another position once Mr. Wallace returned to the Brentwood facility.

*Crespo v. Schering–Plough Del Caribe Inc.,* 354 F.3d 34, 39, 45–46 (1st Cir.2003) (holding that plaintiff's allegations that her supervisor was a lesbian and that she made improper remarks to her, including telling the plaintiff to invite her to lunch and making comments about plaintiff's co-workers' "private lives and sexual preferences . . . [,]" and, on one occasion approaching the plaintiff "from behind, hugg[ing] her, and whisper[ing] in her ear a request for a cookie from another table[,]" did not suffice to establish a hostile working environment.); *Tatum v. Hyatt Corp.,* 918 F.Supp. 5, 7 (D.D.C.1994) (holding that plaintiff's allegation of one incident where supervisor wrapped his arms around her and made sexually explicit statements was not sufficient to establish a claim of a hostile working environment; "absent the most stringent circumstances, courts have refused to hold that one incident in itself was so severe as to create a hostile work environment.") (citations omitted); *cf. Ferris v. Delta Air Lines, Inc.,* 277 F.3d 128, 136 (2d Cir.2001) (holding that "[a]lthough a continuing pattern of hostile or abusive behavior is ordinarily required to establish a hostile environment, a single instance can suffice when it is sufficiently egregious[ ]" and holding that the plaintiff established that she suffered a sexually hostile working environment where she alleged she was raped by a male co-worker).

Accordingly, given the totality of the circumstances, including the plaintiff's and Mr. Wallace's working relationship over the prior two years, plaintiff's failure to ever voice any complaints to management that Mr. Wallace's behavior allegedly made plaintiff uncomfortable, and the fact that the conditions of plaintiff's working environment were not altered, there being nothing in the record indicating that prior to or after this incident plaintiff was unable to perform efficiently in his work environment due to Mr. Wallace's conduct, *see Lee–Crespo,* 354 F.3d 34, 45–46 (holding that plaintiff did not establish a severe or pervasive hostile work environment where "the complained of conduct was episodic, but not so frequent as to become pervasive; was never severe; was never physically threatening (though occasionally discomforting or mildly humiliating); and significantly, was never according to the record, an impediment to [the plaintiff's] work performance."), the Court grants summary judgment to the defendant on plaintiff's sexual harassment claim.

## C. Plaintiff's Retaliation Claim

▮▮▮▮▮ Plaintiff alleges that after he complained about Mr. Wallace, he was retaliated against.[19] To establish a *prima facie* claim of retaliation, "plaintiff must establish that he engaged in activity protected by Title VII, that the employer took an adverse employment action against him, and that the adverse action was causally related to the exercise of his rights." *Cones v. Shalala,* 199 F.3d 512, 521 (D.C.Cir.2000) (citing *Paquin v. Federal Nat'l Mortgage Ass'n,* 119 F.3d 23, 31 (D.C.Cir.1997)). Adverse actions are de-

---

**19.** Actually, within a day or two after plaintiff complained to management about Mr. Wallace's actions, Mr. Wallace was transferred to the *Southern District of Maryland* "[a]nd he was gone for awhile." Def.'s Mot., Ex. A, Jones Dep. at 101. However, after an investigation into the incident was completed, Mr. Higgenbotham, the maintenance manager, determined that the incident was in the nature of horseplay, returned Mr. Wallace to his former position, and gave him a letter of warning in lieu of a seven day suspension. Def.'s Mot., Ex. H, Declaration of Louis I. Higginbotham dated June 27, 2003 ("Higginbotham Decl.") ¶¶ 4–6. And when Mr. Wallace returned to the Brentwood facility, plaintiff was not placed under his direct supervision, but rather was under the direct supervision of Laura Gaskins. Def.'s Mot., Ex. A, Jones Dep. at 103.

fined by the District of Columbia Circuit as "tangible employment action[s] [that] constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Brown v. Brody*, 199 F.3d 446, 456–57 (D.C.Cir.1999) (citations omitted). Once the plaintiff has established a prima facie case, it is the employer's burden "to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected, or someone else was preferred, for a legitimate, nondiscriminatory reason." *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Cones*, 199 F.3d at 520–21. Once the defendant has met this burden, the burden then shifts back to the plaintiff "to demonstrate that the proffered reason was not the true reason for the employment decision[,] [which he can do] . . . either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Id.* at 256, 101 S.Ct. 1089(citing *McDonnell Douglas*, 411 U.S. at 804–05, 93 S.Ct. 1817). The Court finds that none of the actions plaintiff complains about constitute adverse actions sufficient to establish a case of retaliation or, alternatively, that plaintiff has failed to rebut the defendant's legitimate explanation for its actions.

First, the plaintiff claims the defendant retaliated against him by reassigning him from the stock room to the building services department.[20] However, plaintiff did not testify that this assignment was a less desirable assignment; rather, when asked whether the assignment was less desirable, he stated, "Well,

it didn't bother me, but I knew they did it because of retaliation." Def.'s Mot., Ex. A, Jones Dep. at 106. Furthermore, he was informed by his supervisor at that time, Laura Gaskins, that he was being transferred because he had stated that he did not want to work under Mr. Wallace's supervision. *Id.* at 107; *see also* Def.'s Mot., Ex. E, Declaration of Laura Gaskins, ("Gaskins' Decl.") ¶ 3 (stating that the plaintiff was transferred to the building services area in accordance with his request that he not work in an area that was under Mr. Wallace's management). Plaintiff does not deny making this request, although he stated that he did not even want to work in the same building as Mr. Wallace, because he still saw him daily, although Mr. Wallace did not speak to him. Def.'s Mot., Ex. A, Jones Dep. at 107, 110. Furthermore, it is undisputed that once Mr. Wallace was permanently transferred, plaintiff was brought back to the stock room to work, and plaintiff's temporary reassignment did not result in the lost of grade level or pay. *Id.* at 132; Def.'s Mot., Ex. E, Gaskins' Decl. ¶ 4. These circumstances do not permit the Court to conclude that plaintiff's temporary assignment to the building services department amounted to an adverse employment action. *See Brodetski v. Duffey*, 141 F.Supp.2d 35, 45 (D.D.C.2001) (holding that "defendants' decision to change the office schedule, without allowing plaintiff leave to alter his personal schedule, did not constitute an adverse action. Although plaintiff allege[d] that, because of the schedule revisions, he was forced to come in two hours early for his shift, 'a mere inconvenience' is not sufficiently adverse to sustain a prima facie case.") (citation omitted). More significantly, plaintiff cannot refute the defendant's legitimate

---

**20.** Plaintiff's reference in his complaint to being harassed "on a daily basis[,]" Compl. ¶ 13, references his temporary re-assignment to the building services department because he believed "it was harassment." Def.'s Mot., Ex. A, Jones Dep. at 130.

reason for his transfer, namely, that the defendant complied with plaintiff's request that he not work under Mr. Wallace's supervision. *See Lofton v. Roskens*, 743 F.Supp. 6, 10 (D.D.C.1990), *aff'd*, 950 F.2d 797 (D.C.Cir.1991) (holding that plaintiff failed to establish that her transfer to another department was retaliatory as opposed to her employer's attempt to "diffuse a personality conflict."); *cf. Villines v. United Brotherhood of Carpenters & Joiners of America, AFL–CIO*, 999 F.Supp. 97, 106 (D.D.C.1998) (holding that plaintiff established a prima facie claim of retaliation because the defendant's failure to transfer her out of her abusive working environment could be viewed as an "adverse personnel action" and there was a causal link between the filing of plaintiff's complaint and the defendant's failure to transfer her).

Next, plaintiff claims he was denied the opportunity to work overtime on the occasions when his co-worker, Mr. Newell, was out of the office. The defendant has stated that it is the policy of the Post Office to avoid paying overtime to reduce its expenses. Def.'s Mot., Ex. E, Gaskins' Decl. ¶ 8. Plaintiff does not refute this explanation in his opposition; he testified at his deposition that he did not "know about the Post Office['s policies]." Def.'s

Mot., Ex. A, Jones Dep. at 125. Plaintiff appears to argue that it would have made more sense, business wise, to grant him the overtime rather than give it to someone else. *Id.* However, "Title VII ... does not authorize a federal court to become 'a super-personnel department that reexamines an entity's business decisions.' " *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C.Cir.1999) (citation omitted); *see also Brodetski*, 141 F.Supp.2d at 45 (holding that "[p]laintiff's ... complaint concerning work inequity alleg[ing] that defendants required him to do the same work that employees did in higher positions[,]" was "the level of personnel decision-making in which courts should not meddle."). Accordingly, in light of plaintiff's failure to refute the defendant's legitimate business reason for not affording him overtime, the Court concludes that plaintiff's denial of overtime claim is not actionable.

Finally,[21] plaintiff complains that the defendant's dismantling of a cubicle he and Mr. Newell used as their work station constituted retaliation. According to the affidavit of Laura Gaskins, this cubicle was dismantled because it was in disrepair and posed a safety hazard. Def.'s Mot., Ex. E, Gaskins' Decl. ¶ 5. Although plaintiff said that he "heard the rumor

---

21. Plaintiff also contends in his opposition and his declaration filed in support of his opposition that his supervisor—Laura Gaskins, after the incident with Mr. Wallace, "put adverse entries in [his] attendance record, labeling those times as 'unscheduled leave,' which can and has been used for disciplinary actions against me and other employees." Pl.'s Opp'n, Ex. 26, Declaration of Mildred Jones dated June 25, 2003 ("Jones' Decl.") ¶ 11. Plaintiff fails to indicate exactly what disciplinary action was taken against him, however. This omission precludes the Court from finding that these alleged entries constituted adverse employment actions taken against the plaintiff in retaliation for his EEO activity. *See Stewart v. Evans*, 275 F.3d 1126,

1136 (D.C.Cir.2002) ("formal criticisms or reprimands, without additional disciplinary action such as a change in grade, salary, or other benefits, do not constitute adverse employment actions.") (citation omitted). In his declaration, plaintiff also states that Mr. Higginbotham denied or failed to act upon his request for schedule changes. Pl.'s Opp'n, Ex. 26, Jones Decl. ¶ 11. Other than possibly being an inconvenience, plaintiff has failed to establish how this denial or inaction disadvantaged him and therefore he has failed to state a claim upon which relief can be granted as to this allegation. *See Brodetski*, 141 F.Supp.2d at 44 (" '[A] mere inconvenience' is not sufficiently adverse to sustain a prima facie case.") (citations omitted).

about [the cubicle] being unsafe[,]" he contends that the cubicle was not in disrepair and was removed solely in retaliation for his EEO complaint. Def.'s Mot., Ex. A, Jones Dep. at 113, 115. However, plaintiff did not testify that he was unable to complete his work assignments; rather, he testified that the result of the cubicle being dismantled was that he "had no place to put none of [his] stuff[,]" which included "records and stuff[,]" although he testified that the cubicle was replaced with a desk, albeit a small one. *Id.* at 114–15. These facts do not support a finding of an adverse action sufficient to establish a prima facie case of retaliation. *See, e.g., Brodetski*, 141 F.Supp.2d at 45 (holding that "[p]laintiff's allegations that defendants denied him his right to choose a new workstation on two occasions do not constitute adverse employment actions even if they made plaintiff feel slighted or wrong.") (citation omitted).

### III. Conclusion

For the reasons set forth above, the Court concludes that summary judgment regarding the plaintiff's sexual harassment and retaliation claims is warranted in the defendant's favor. While Mr. Wallace's actions were not in accordance with proper workplace etiquette, "a supervisor's unprofessional managerial approach and accompanying efforts to assert his authority are not the focus of the discrimination laws." *Lee–Crespo*, 354 F.3d 34, 47. Nor are any of the claims of retaliation actionable as they were not adverse employment actions and the defendant has asserted legitimate reasons for its actions. Accordingly, summary judgment is entered in favor of the defendant and plaintiff's complaint is dismissed with prejudice.

**SO ORDERED** on this 22nd day of January, 2004.[22]

22. An Order consistent with the Court's rul-

*ORDER*

For the reasons set forth in the Memorandum Opinion that is being issued contemporaneously with this Order, it is hereby

**ORDERED** that the defendant's motion for summary judgment is granted. It is further

**ORDERED** that summary judgment shall be entered in the defendant's favor. It is further

**ORDERED** that the plaintiff's complaint is dismissed with prejudice. It is further

**ORDERED** that the pretrial conference date of February 17, 2004, is vacated.

ing accompanies this Memorandum Opinion.