Barbara E. CROMER–KENDALL,
Plaintiff,

v.

**DISTRICT OF COLUMBIA, Defendant.**

No. CIV.A.00–1338(RBW).

United States District Court,
District of Columbia.

July 9, 2004.

Richard T. Brown, Washington, DC, for Plaintiff.

E. Louise R. Phillips, Patricia Ann Jones, Office Of Corporation Counsel, D.C., Washington, DC, for Defendant.

## MEMORANDUM OPINION

WALTON, District Judge.

This is an action brought under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2. The plaintiff is seeking redress for alleged "same sex" discrimination, sexual harassment, the creation of a sexually hostile work environment, retaliation, and severe emotional distress.[1] This matter is currently before the Court on the defendant's Motion for Summary Judgment ("Def.'s Mot."), the plaintiff's opposition to the motion ("Pl.'s Opp."), and the defendant's reply. For the reasons set forth below, the defendant's motion for summary judgment will be granted in part and denied in part.[2]

## I. Factual Background

According to the plaintiff, the following are the events that resulted in the filing of this lawsuit. The plaintiff became a police officer with the District of Columbia's Metropolitan Police Department ("MPD") on or about December 6, 1985. Second Amended Complaint (hereinafter "Compl.") ¶ 6. In July of 1989, the plaintiff was assigned to the Sixth District of the MPD where she remained until May of 2000. *Id.* Sgt. Denise Calhoun ("Sgt.Calhoun") also worked at the Sixth District while the plaintiff worked there and was one of the plaintiff's superiors. *Id.* ¶ 7.

1. The plaintiff states in the first paragraph of her complaint that she is suing for severe emotional distress. However, the Second Amended Complaint does not address this claim or articulate any facts to support the elements of this claim. Therefore, the Court assumes that the plaintiff has abandoned this claim and it will not be addressed in this Opinion.

2. The defendant also asserts that because the plaintiff did not specifically allege claims of a hostile work environment, physical touching or retaliation in her Metropolitan Police Department Office of Human Resources ("OHR") complaint, she has failed to exhaust her administrative remedies with respect to these claims. Memorandum of Points and Authorities in Support of Defendant District of Columbia's Motion for Summary Judgment ("Def.'s Mem.") at 10. The plaintiff cross-filed her administrative complaint with the Equal Employment Opportunity Commission ("EEOC") when she filed her administrative complaint with the OHR. Def.'s Mem. Ex. C at 4; *see Holland v. W. Dev. Corp.*, 799 F.Supp. 181, 182 (D.D.C.1992) (complaint filed with the District of Columbia's OHR automatically caused complaint to be cross-filed with the EEOC). Admittedly, a Title VII lawsuit which is commenced after an administrative complaint is filed with the EEOC is limited in scope to claims that are "like or reasonably related to the allegations of the [EEOC] charge and growing out of such allegations." *Park v. Howard*, 71 F.3d 904, 907 (D.C.Cir.1995) (citing *Cheek v. Western and Southern Life Ins. Co.*, 31 F.3d 497, 500 (7th Cir.1994) (citations and internal quotation marks omitted). "At a minimum, the Title VII claims must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Id.* (citation omitted) Here, the plaintiff has alleged detailed facts in her administrative complaint of sexual harassment and retaliation. For example, in support of her sexual harassment claim, the plaintiff provided a detailed account of an incident at her home where Sgt. Calhoun allegedly disrobed and asked the plaintiff if she had a "pretty ass." Def.'s Mem., Ex. B (Complaint/Witness Statement of B.E. Cromer Kendall dated April 22, 1999) at 3. On that same occasion, Sgt. Calhoun also laid on the plaintiff's living room floor and repeatedly called out the plaintiff's name for her to join her. *Id.* at 5. Thus, the plaintiff clearly alleges facts that would cause the administrative investigation to focus on whether she had been sexually harassed. Therefore, the defendant's argument is without merit.

Sgt. Calhoun began inviting the plaintiff to join her for drinks after work and the plaintiff agreed to do so occasionally. *Id.* During the summer of 1995 Sgt. Calhoun called the plaintiff at her home and asked the plaintiff to join her at a beach house when the plaintiff would not be on duty. *Id.* ¶ 8. Because Sgt. Calhoun would not allow the plaintiff to bring her daughter to the beach house she declined the offer. *Id.* Shortly after the plaintiff's refusal to join Sgt. Calhoun at the beach house, Sgt. Calhoun saw the plaintiff's mother on the street and expressed to her that she was angry with the plaintiff. *Id.* ¶ 8. Thereafter, when the plaintiff refused invitations from Sgt. Calhoun to join her for drinks, Sgt. Calhoun began inviting herself to visit with the plaintiff at her home. *Id.* ¶ 9. Although the plaintiff rejected the invitations, she allowed Sgt. Calhoun to enter her home whenever she appeared because the plaintiff feared that Sgt. Calhoun would retaliate against her if she rejected Sgt. Calhoun's visits, having heard that Sgt. Calhoun had a violent temper. *Id.*

Between June 9 and June 13, 1998, Sgt. Calhoun ordered the plaintiff to meet with her privately in her office after roll-call. *Id.* ¶ 13. Because the plaintiff understood these directives as orders from a superior officer she went directly to Sgt. Calhoun's office after roll-call. *Id.* ¶ 14. However, during these office visits, Sgt. Calhoun adored herself in a mirror and questioned the plaintiff about her (Sgt.Calhoun's) appearance, i.e., whether she was pretty or had a nice body figure. *Id.* When the plaintiff did not reply, Sgt. Calhoun insisted that she was pretty and had a "nice ass" and also encouraged the plaintiff to leave her boyfriend and not return to her husband because "all men had dirty penises." *Id.* On several occasions, not only did Sgt. Calhoun question the plaintiff about her appearance, but "also touched

[the p]laintiff in a manner that ... [was] unsettling, non-consensual and offensive" to the plaintiff. *Id.* ¶ 16.

Apparently, the plaintiff had a back condition and her work schedule fluctuated. *Id.* She was eventually placed on limited duty because of concerns about her back condition. *Id.* ¶ 17. Consequently, she was assigned to work at a Sixth District substation. *Id.* Sgt. Calhoun purportedly hung around the substation for much of the day chatting with the plaintiff. *Id.* ¶ 18. She complained that the plaintiff was not returning her phone calls and questioned the plaintiff about her boyfriend answering the phone when she called. *Id.*

On June 26, 1998, the plaintiff was cooking dinner at her home for her sister when Sgt. Calhoun called the plaintiff and informed her that she would be visiting the plaintiff to celebrate her birthday, and also to enjoy the plaintiff's cooking. *Id.* ¶ 10. When Sgt. Calhoun arrived at the plaintiff's home, she allegedly encountered the plaintiff in her kitchen, removed her lower garments and exposed her genitalia to the plaintiff while asking if she found her (Sgt.Calhoun) attractive. *Id.* ¶ 11. Thereafter, Sgt. Calhoun drew her police-issued weapon and pointed it at two adolescent boys that were visiting at the plaintiff's home and instructed them to leave. *Id.* Sgt. Calhoun then approached the plaintiff again and hugged the plaintiff in the presence of others who were in the house while announcing that she "wanted" the plaintiff. *Id.*; Plaintiff's Statement of Material Facts Regarding Genuine Issues in Dispute ("Pl's Stmt.") at 2. The plaintiff ultimately asked Sgt. Calhoun to leave her home and enlisted the assistance of others to accompany Sgt. Calhoun out of her house. *Id.*

On July 2, 1998, the plaintiff informed Sgt. Thomas [3] about the incident that took

---

3. At the time the plaintiff filed her charge of discrimination with the Equal Employment

place at her home on June 26, 1998. *Id.* ¶ 20. Sgt. Thomas advised the plaintiff that he would take care of the matter. *Id.* Later, on July 7, 1998, Sgt. Calhoun again instructed the plaintiff to come to her office after roll-call. *Id.* ¶ 21. On that occasion, Sgt. Calhoun told the plaintiff that she loved her and when the plaintiff stood up to leave, Sgt. Calhoun pulled the plaintiff's shoulder toward her, "placed her hand firmly on [the p]laintiff's right breast and fondled and caressed it." *Id.* Sgt. Calhoun then instructed the plaintiff to "think about it." *Id.*; Pl.'s Stmt. at 4. The plaintiff also reported this incident to Sgt. Thomas. *Id.* ¶ 22 When told about the second incident Sgt. Thomas allegedly laughed and agreed to intercede while advising the plaintiff to calm down. *Id.* The plaintiff also reported that she had been sexually harassed by Sgt. Calhoun to Deputy Chief Musgrove. *Id.* ¶ 23. Musgrove instructed the plaintiff to immediately report her complaints to the MPD's Equal Employment Opportunity ("EEO") office. *Id.*

The plaintiff also contends that when she was on foot patrol, Sgt. Calhoun would regularly seek her out and ask if she could join her. *Id.* ¶ 24. Regardless of which patrol the plaintiff was assigned, she would get numerous radio calls from Sgt. Calhoun. Pl.'s Stmt. at 5. On two occasions, Sgt. Calhoun picked up the plaintiff from foot patrol and took her to her home claiming that she wanted to show the plaintiff improvements she had made to her home. *Id* ¶ 25. She then showed plaintiff the hot tub and bedroom and invited plaintiff to come over and stay at any time. *Id.*; Pl.'s Stmt. at 5. On several occasions, Sgt. Calhoun would locate the plaintiff when she was patrolling alone and would take the opportunity to use her squad car to take the plaintiff for rides outside of her sector, or attempt to discuss the same topics raised when the plaintiff went to her office after roll-call. Pl.'s Stmt. at 5. On at least three occasions Sgt. Calhoun directed the plaintiff to join her at a local restaurant for food and drinks. *Id.*

On April 10, 1999, the plaintiff was told by Sgt. Calhoun to guard a gunshot wound victim's car that was parked in a MPD substation parking lot. Compl. ¶ 26. The officer responsible for investigating the shooting then told the plaintiff that she could terminate her watch of the car. *Id.* The plaintiff then called her partner and asked to be picked up at the lot. *Id.* When Sgt. Calhoun returned to the substation parking lot she "loudly and angrily chastised [the p]laintiff" for not remaining with the vehicle as instructed. *Id.* Later, "Sgt. Calhoun threatened to charge [the p]laintiff with insubordination" and told the plaintiff, in the presence of Sgt. Thomas, that she would be relieved of "her badge and gun if [she] was ever insubordinate again." *Id.* The encounter reduced the plaintiff to tears. *Id.*

The plaintiff, fearful of the consequences of advancing her complaint to a higher level in the police department, reported to her union steward that she was being harassed by Sgt. Calhoun. *Id.* ¶ 27. The plaintiff was instructed to "report her complaint [to] the internal EEO office of the police department." *Id.* The plaintiff filed a complaint with the EEO office on April 12, 1999. *Id.* ¶ 28. Consequently, the plaintiff was transferred to a different "Sector" of the Sixth District in an effort to shield her from further contact with Sgt. Calhoun. *Id.* Later, in August of 1999, the plaintiff also filed a claim with the District of Columbia Office of Human Rights and Local Business Development

---

Opportunity office ("EEO") Sgt. Thomas was the plaintiff's first line supervisor. Def.'s

Mem., Ex. A (Informal Complaint Form dated April 20, 1999 and filed by Barbara Cromer).

*Id.* ¶ 29. Despite working in the new Sector, the plaintiff began encountering Sgt. Calhoun again frequently because they were working during the same hours. *Id.* In December of 1999, the plaintiff returned to the EEO office and requested another transfer. *Id.* ¶ 30. The plaintiff was advised that the EEO office could no longer assist her because she had filed a complaint with the District of Columbia Department of Human Rights. *Id.* In December of 1999, the plaintiff sought additional help at the Police and Fire Clinic. *Id.* ¶ 31. The plaintiff was then placed on sick leave by a psychiatrist until May of 2000. *Id.* When she attempted to return to work, she learned that she would have to work again "in the vicinity of Sgt. Calhoun" and therefore, on her own initiative, opted to remain on sick leave without pay. *Id.* After an additional two months, the plaintiff returned to work upon being transferred to another police department district. *Id.*

## II. Analysis

### A. Standard of Review for Summary Judgment

The defendant has moved for summary judgment. Summary judgment is appropriate when there is "no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c) A genuine issue of material fact exists if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Id.* at 255, 106 S.Ct. 2505. Summary judgment is mandated after there has been "adequate time for discovery ... against a party who fails to make a show-

ing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Summary judgment, nonetheless, is a "drastic remedy, [and therefore] courts should grant it with caution so that no person will be deprived of his or her day in court to prove a disputed material factual issue." *Greenberg v. Food & Drug Admin.*, 803 F.2d 1213, 1216 (D.C.Cir.1986). Summary judgment is accordingly not appropriate, for example, where "the evidence presented on a dispositive issue is subject to conflicting interpretations, or reasonable persons might differ as to its significance ...." *Id.* (citations omitted). Furthermore, when reviewing the evidence, "all inferences must be drawn in favor of the nonmoving party[.]" *Coward v. ADT Security Systems, Inc.*, 194 F.3d 155, 158 (D.C.Cir. 1999); *Aka v. Washington Hosp. Center*, 156 F.3d 1284, 1295 (D.C.Cir.1998).

### B. The Plaintiff's Title VII Claim

■ "[S]ex discrimination consisting of same-sex sexual harassment is actionable under Title VII...." *See Oncale v. Sundowner Offshore Services Inc.*, 523 U.S. 75, 82, 118 S.Ct. 998, 140 L.Ed.2d 201 (1998). The *Oncale* Court emphasized that claims of same-sex harassment remain subject to the identical requirements as claims of opposite-sex harassment; namely, a plaintiff making either type of sexual harassment claim "must always prove that the conduct at issue ... actually constituted 'discrimina[tion] ... because of ... sex.'" *Id.* at 81, 118 S.Ct. 998. Thus, to establish [her] claim of "same-sex harassment, [the] court[ ] first must determine whether the harasser's conduct constitutes sex discrimination." *See Jones v. Potter*, 301 F.Supp.2d 1, 7 (D.D.C.2004) (citing *La*

*Day v. Catalyst Technology, Inc.*, 302 F.3d 474, 478 (5th Cir.2002)). "If this determination is answered in the affirmative, the court must decide whether the challenged conduct meets the applicable standards for either a *quid pro quo* or hostile environment claim." *Id.*[4]

### 1. "Same Sex" Discrimination

"There are three ways to prove that same-sex sexual behavior rises to the level of illegal harassment." *Id.* (citing *Davis v. Coastal Int'l Security, Inc.*, 275 F.3d 1119, 1123 (D.C.Cir.2002)). "The first method requires a showing 'that the sexual behavior is motivated by actual homosexual desire.'" *Id.* "The second method of demonstrating same-sex harassment requires a showing 'that the harassment is framed in such sex-specific and derogatory terms . . . as to make it clear that the harasser is motivated by general hostility' towards members of the same gender in the workplace." *Id.* (citing *Oncale*, 523 U.S. at 80, 118 S.Ct. 998). "Third, the plaintiff may demonstrate 'that there is direct comparative evidence about how the alleged harasser treated members of both sexes in a mixed-sex workplace.'" *Id.* (quoting *Oncale*, 523 U.S. at 80–81, 118 S.Ct. 998). "Whatever evidentiary route the plaintiff chooses to follow, he or she must always prove that the conduct at issue was not merely tinged with offensive sexual connotations, but actually constituted 'discrimination . . . because of . . . sex.'" *Oncale*, 523 U.S. at 81, 118 S.Ct. 998.

■ Here, the plaintiff relies on the first method to prove her case—that Sgt. Calhoun's behavior was motivated by actual homosexual desire. "[T]here are two types of evidence that are likely to be especially 'credible' proof that the harasser may be a homosexual." *La Day*, 302 F.3d at 480. "The first is evidence suggesting that the harasser intended to have some kind of sexual contact with the plaintiff rather than merely to humiliate [her] for reasons unrelated to sexual interest." *Id.* "The second is proof that the alleged harasser made same-sex sexual advances to others, especially to other employees." *Id.*

The record contains abundant evidence of sexual advances by Sgt. Calhoun both to the plaintiff, and allegations that Sgt. Calhoun harassed other female employees.[5] For example, the plaintiff asserts that Sgt. Calhoun "approached plaintiff, who was alone in her kitchen, and removed her lower garments. She then bent over and exposed her naked genitalia to [the][p]laintiff and asked whether she found her attractive." Compl. ¶ 11. Additionally, the plaintiff claims that Sgt. Calhoun physically leaned on her and told the plaintiff that she wanted her and then asked the plaintiff if she thought (Sgt.Calhoun) had a

---

4. "*Quid pro quo*" discrimination cases are those involving " 'tangible employment action' that 'resulted from [the employee's] acceptance or rejection of his supervisor's alleged sexual harassment.' " *La Day*, 302 F.3d at 481 (citation omitted). A plaintiff may establish a *quid pro quo* claim in lieu of a hostile working environment claim because "[w]hen a plaintiff proves that a tangible employment action resulted from a refusal [or agreement] to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII." (citing

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 753–54, 118 S.Ct. 2257, 141 L.Ed.2d 633(1998)).

5. The plaintiff spoke with another female officer, who advised her that she had also been sexually harassed by Sgt. Calhoun. Plaintiff's Statement of Material Facts Regarding Genuine Issues in Dispute. ("Pl.'s Stmt.") at 7. Furthermore, this officer informed the plaintiff that there had been other complaints from female officers about Sgt. Calhoun making unwanted, sexual advances. *Id.*

"pretty ass." Plaintiff's Statement of Material Facts Regarding Genuine Issues in Dispute ("Pl.'s Stmt.") at 2. Furthermore, Sgt. Calhoun allegedly told the plaintiff that she should leave her boyfriend and not return to her husband because "all men had 'dirty penises.'" Compl. ¶ 14. On another occasion, Sgt. Calhoun purportedly gave the plaintiff a tour of her bedrooms and informed the plaintiff that she had an open invitation to stay in Sgt. Calhoun's bedroom. Pl.'s Stmt. at 5. The plaintiff also contends that Sgt. Calhoun placed her hand on the plaintiff's breast, caressed it and slowly brought her right-hand fingers to the tip of plaintiff's nipple and asked the plaintiff to "think about it." *Id.* at 4.

These allegations are sufficient to prove that Sgt. Calhoun's actions toward the plaintiff were motivated by actual homosexual desire. *Potter*, 301 F.Supp.2d at 7. "Although none of these incidents necessarily proves that [Sgt. Calhoun] is gay, the connotations of sexual interest in [the plaintiff] certainly suggest that [Sgt. Calhoun] might be sexually oriented toward members of the same sex... [and in turn] leaves ample room for the inference that [Sgt. Calhoun] harassed [the plaintiff] because [she] is a [woman]." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1010 (7th Cir.1999) (citations omitted). This Court therefore concludes that a reasonable juror could conclude that Sgt. Calhoun harassed the plaintiff because she is a woman.

### 2. Hostile Environment Sexual Harassment

"Once sex discrimination has been proven sufficiently to survive summary judgment ... there is no distinction between same-sex and opposite-sex harassment with respect to the next stage of the inquiry: determining whether the discriminatory action was serious enough to constitute *quid pro quo* or hostile environment harassment." *Potter*, 301 F.Supp.2d at 9. Here, the plaintiff has presented no evidence of *quid pro quo* sexual harassment, but rather specifically alleges that Sgt. Calhoun created a hostile work environment resulting from her sexual harassment of the plaintiff. Compl. ¶ 1.

■ To establish a *prima facie* case of the existence of a hostile work environment based on sexual harassment, the plaintiff must state facts sufficient to prove each of the following elements: (1) she was subjected to harassment because of her sex; (2) she found the harassment subjectively unwelcome; (3) the harassment was sufficiently severe or pervasive to create an abusive, hostile working environment; and (4) she has some basis for imputing liability for the harassment to the employer. *Sullivan–Obst v. Powell*, 300 F.Supp.2d 85, 97 (D.D.C.2004). " 'Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment—an environment that a reasonable person would find hostile or abusive—is beyond Title VII's purview.' " *Oncale*, 523 U.S. at 81, 118 S.Ct. 998 (quoting *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993)) (citing *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986)). " 'In order to be actionable under [Title VII], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so.' " *Butler v. Ysleta Indep. Sch. Dist.*, 161 F.3d 263, 269 (5th Cir.1998) (quoting *Faragher v. City of Boca Raton*, 524 U.S. 775, 787, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998)). " 'Whether an environment meets this standard depends on 'all the circumstances,' including the frequency of the discriminatory con-

duct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* (quoting *Faragher*, 524 U.S. at 787, 118 S.Ct. 2275.) As contrasting examples of what does and does not constitute sexual harassment, the Supreme Court noted that while a "football player's working environment [would not be considered] severely or pervasively abusive ... for example, if the coach smacks him on the buttocks as he heads onto the field ... the same behavior would reasonably be experienced as abusive by the coach's secretary (male or female) back at the office." *Oncale*, 523 U.S. at 82, 118 S.Ct. 998.

The defendant posits that the plaintiff's sexual harassment claims must be dismissed because she cannot demonstrate that the alleged harassing behavior was sufficiently "severe or pervasive" to be actionable under Title VII. Defendant's Memorandum of Points and Authorities in Support of Defendant District of Columbia's Motion for Summary Judgment. ("Def.'s Mem.") at 4. As an initial matter, the defendant seeks to discredit the incident that allegedly occurred in plaintiff's home by stating that "[t]here is no allegation that the 'fish fry' occurred during business hours and/or that anything that occurred at the 'fish fry' had any relation to the District's business."[6] *Id.* Moreover, the defendant claims, that the "[p]laintiff's second allegations do not rise to the level of severe or pervasive conduct." *Id.* The plaintiff, on the other hand, argues that "severity is established by Sgt. Calhoun's behavior at the 'fish fry' and the several instances when she engaged in the nonconsentual [sic], physical touching of plaintiff,

the worst instance of which being the time when she caressed [p]laintiff's breast while the [p]laintiff was in her office." Plaintiff's Opposition to Defendant's Motion for Summary Judgment ("Pl.'s Opp.") at 10. Moreover, the plaintiff contends that Sgt. Calhoun's frequent unwelcome comments about her "pretty ass," "men's dirty penises," and remarks about the plaintiff's husband and her boyfriend adequately demonstrate the pervasiveness of the harassment to which the plaintiff was subjected. *Id.* at 10–11.

■ This Court concludes, based upon the above facts, that a reasonable jury could conclude that Sgt. Calhoun's actions toward the plaintiff were severe and pervasive enough to create an objectively hostile or abusive work environment. Although the incident that occurred at the plaintiff's home, as the defendant points out, did not take place at the workplace, Def.'s Mem. at 5, Sgt. Calhoun's actions at the plaintiff's home as well as in the workplace contributed to a hostile or abusive work environment. In *Parrish v. Sollecito*, 249 F.Supp.2d 342, 350 (S.D.N.Y.2003) the Court stated

> The proper focus of sexual harassment jurisprudence is not on any particular point in time or coordinate location that rigidly affixes the employment relationship, but on the manifest conduct associated with it, on whether the employer has created a hostile or abusive 'work environment,' or a 'workplace' where sexual offenses occur and are sufficiently severe or pervasive to alter the victim's terms and conditions of employment wherever the employment relationship reasonably carries.

---

6. The defendant refers to the incident that took place at the plaintiff's home on June 26, 1998 as the "fish fry" incident.

Moreover, "[a] supervisor's unwanted sexual abuse that takes place outside the confines of the physical plant ... should amount to a virtual extension of the working environment." *Id.* at 351. "[O]ften such outside misbehavior rebounds and transposes its consequences inside the actual workplace itself." *Id.* at 352. Accordingly, the reach of the employment "environment" should be viewed holistically. "Only harassing conduct that is 'severe or pervasive' can produce a 'constructive alteratio[n] in the terms or conditions of employment.'" *Ellerth,* 524 U.S. at 752, 118 S.Ct. 2257; *Oncale,* 523 U.S. at 81, 118 S.Ct. 998 (Title VII "forbids only behavior so objectively offensive as to alter the 'conditions' of the victim's employment"); *Faragher,* 524 U.S. at 787–788, 118 S.Ct. 2275 ("Workplace conduct is not measured in isolation; instead, 'whether an environment is sufficiently hostile or abusive' must be judged 'by looking at all the circumstances,' including ... whether it unreasonably interferes with an employee's work performance."). "The objective severity of harassment should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *Oncale,* 523 U.S. at 81, 118 S.Ct. 998.

The severity of Sgt. Calhoun's actions are clearly demonstrated by her behavior at the plaintiff's home when she pulled out her service revolver and ordered two of the plaintiff's adolescent guests to leave and subsequently disrobed in front of the plaintiff and her guests. Additionally, the severity of Sgt. Calhoun's actions are demonstrated by Sgt. Calhoun having squeezed or hugged the plaintiff while she was in Sgt. Calhoun's office and ultimately Sgt. Calhoun caressing one of the plaintiff's breast. On the occasion when Sgt. Calhoun touched the plaintiff's breast, she told the plaintiff that she loved her and when the plaintiff stood up to leave Sgt. Calhoun's office, Sgt. Calhoun pulled the plaintiff's shoulder toward her, placed her hand firmly on the plaintiff's right breast while fondling and caressing the plaintiff's breast and telling the plaintiff to "think about it." Pl.'s Stmt. at 4. Similarly, the pervasiveness of Sgt. Calhoun's actions are demonstrated by Sgt. Calhoun's unrelenting persistence in seeking the plaintiff out and staying abreast of her whereabouts.[7] For example, Sgt. Calhoun ordered the plaintiff to come to her office after roll-call on several occasions. Compl. ¶ 21; Pl.'s Stmt. at 3–4. At these meetings in her office, Sgt. Calhoun would ask the plaintiff if she found her attractive and communicated to the plaintiff that she loved her. *Id.* at 4. Additionally, on several occasions, Sgt. Calhoun would locate the plaintiff when she was patrolling alone and would take the opportunity to use her squad car to take the plaintiff for rides outside of her sector, or attempt to discuss the same topics raised when the plaintiff went to her office after roll-call. *Id.* On at least three occasions Sgt. Calhoun directed the plaintiff to join her at a local restaurant for food and drinks. *Id.* On another occasion the plaintiff joined Sgt. Calhoun at her home to observe improvements Sgt. Calhoun had made at her home. *Id.* During

---

7. The record indicates that the plaintiff was allegedly subjected to harassment by Sgt. Calhoun for a period of ten (10) months prior to her reporting Sgt. Calhoun's behavior to the EEO office. The first incident occurred in early June of 1998, and the plaintiff reported her claim to the EEO office on April 12, 1999. Compl. ¶ 28. Thus, at a minimum, the plaintiff was allegedly subjected to constant harassment for ten months. However, the plaintiff, in support of her claim for retaliation as discussed later in this Opinion, further alleges that even after she reported her claims to the EEO office, Sgt. Calhoun's harassment continued.

that visit Sgt. Calhoun gave the plaintiff a tour of her bedroom and invited the plaintiff to stay in her bedroom whenever she liked. *Id.* The plaintiff complains that during these encounters, she was extremely anxious and frightened. *Id.* The plaintiff states that she complied with Sgt. Calhoun's orders because she feared Sgt. Calhoun and felt she had to follow her supervisor's orders. *Id.* at 6. Moreover, Sgt. Calhoun's comments about her "pretty ass," men's "dirty penises," and critical remarks about the plaintiff's husband and her boyfriend, Pl.'s Opp. at 10, all contributed to the pervasiveness of Sgt. Calhoun's behavior.

"In order to be actionable under [Title VII], a sexually objectionable environment must be both objectively and subjectively offensive, one that a reasonable person would find hostile or abusive, and one that the victim in fact did perceive to be so." *Butler v. Ysleta Indep. Sch Dist.,* 161 F.3d 263, 269 (5th Cir.1998) (quoting *Faragher,* 524 U.S. at 787, 118 S.Ct. 2275). Here, a jury could conclude that Sgt. Calhoun's conduct created an objectively hostile environment and that the plaintiff subjectively perceived [her] working conditions as abusive. *See Bailey v. Runyon,* 167 F.3d 466, 467, 469 (8th Cir.1999) (evidence indicating that employee was subjected to persistent requests for a sexual relationship, was grabbed in the crotch, and subjected to several requests to have oral sex performed on him, supported jury's finding of same sex sexual harassment); *see also Lucero–Nelson v. Washington Metro. Area Transit Auth.,* 1 F.Supp.2d 1, 3, 6 (D.D.C.1998) (female supervisor's questioning of female plaintiff about her sexual habits, experiences and preference in sexual partners, coupled with supervisor asking co-workers to admire plaintiff's legs and discussing the plaintiff's looks in front of others, was sufficient to support a hostile work environment claim). Viewing the

facts in the light most favorable to the plaintiff, as the Court must do at this juncture, the Court concludes that the plaintiff has alleged a viable hostile work environment claim as a matter of law. *Id.* at 6. Therefore, the defendant's motion for summary judgment as to the plaintiff's Title VII claim is denied because she has established that the sexual harassment she was subjected to created a hostile work environment.

## C. Retaliation

■■■ To establish a *prima facie* claim of retaliation the "plaintiff must establish that she engaged in activity protected by Title VII, that the employer took an adverse employment action against her, and that the adverse action was causally related to the exercise of her rights." *Cones v. Shalala,* 199 F.3d 512, 521 (D.C.Cir.2000) (citing *Paquin v. Federal Nat'l Mortgage Ass'n,* 119 F.3d 23, 31 (D.C.Cir.1997)). Adverse actions are defined by the District of Columbia Circuit as "tangible employment action[s] [that] constitute a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Brown v. Brody,* 199 F.3d 446, 456–57 (D.C.Cir.1999) (citations omitted). A critical element in establishing a *prima facie* case of retaliation is a showing by the plaintiff that she suffered an adverse personnel action.

[A]n employee suffers an adverse employment action if [s]he experiences materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm.

*Forkkio v. Powell,* 306 F.3d 1127, 1131 (D.C.Cir.2002) (citing *Brown,* 199 F.3d at

457). As such, a common element required for retaliation claims against federal employers is some form of legally cognizable adverse action by the employer. *Id.*

In support of her claim of retaliation, the plaintiff asserts that: (1) Sgt. Calhoun pursued a disciplinary action seeking a "written reprimand" against her for reporting or opposing Sgt. Calhoun's same-sex sexual harassment of the plaintiff; (2) the EEO office did not provide the plaintiff with her rightful employment benefit of receiving a properly conducted investigation into her allegations as provided for by the MPD General Orders; (3) she suffered severe distress upon learning that Sgt. Calhoun was violating the EEO office's directive to stay away from the plaintiff once the plaintiff had been transferred to a different Sector of the Sixth District; (4) the failure of the plaintiff's supervisors following her transfer to undertake any preventive or corrective actions when she reported Sgt. Calhoun's violations of an explicit "stay-away" order; and (5) the EEO office's failure to support plaintiff in her effort to transfer to a different patrol district. Pl.'s Opp. at 14–15. The plaintiff claims that "each of the[se] allege[d] acts of retaliation ... ha[d] a materially adverse affect [sic] on the terms, conditions or privileges of her employment." *Id.* at 15. The plaintiff further contends that the acts of retaliation were "so severe or pervasive as to destroy completely her emotional and psychological stability." *Id.* On the other hand, the defendant argues that the "[p]laintiff has not established that she suffered any adverse action with respect to her employment, as it relates to her retaliation claims." Def.'s Mem. at 11. The Court agrees with the defendant.

 While the record conclusively establishes that the plaintiff engaged in statutorily protected activity, *Baker v. Potter*, 294 F.Supp.2d 33, 41 (D.D.C.2003) (the "[p]laintiff certainly engaged in statutorily protected activity when she filed her EEO complaints ..."), the plaintiff has failed to establish that she was subjected to any adverse employment action. Generally, employment decisions do not "rise to the level of an actionable adverse action ... [under Title VII] unless there is a 'tangible change in duties or working conditions constituting a material employment disadvantage.'" *Walker v. WMATA*, 102 F.Supp.2d 24, 29 (D.D.C.2000) (citation omitted). Changes in work assignments or work-related duties do not ordinarily constitute adverse employment decisions if unaccompanied by a decrease in salary or a change in work hours. *Brown v. Brody*, 199 F.3d at 452. Rather, a plaintiff must adduce evidence of a "significant change in employment status[ ]" to establish a *prima facie* case of retaliation. *Walker*, 102 F.Supp.2d at 29. (quoting *Ellerth*, 524 U.S. at 761, 118 S.Ct. 2257). Here, the actions taken by the defendant with respect to the plaintiff actually illustrate the defendant's attempt to improve the plaintiff's work environment, as opposed to adversely affecting it.

First, the record conclusively establishes that when the plaintiff reported her complaints regarding Sgt. Calhoun, the defendant promptly addressed the situation by transferring her to a location away from Sgt. Calhoun. Complaint ¶ 28. Second, with respect to the written remand against the plaintiff, by plaintiff's own admission, the recommendation for a reprimand was "disapproved" by Commander Rodney Monroe. Pl.'s Stmt. at 8. *See, e.g. Hunter v. Ark*, 3 F.Supp.2d 9, 20 (D.D.C.1998) (scolding employee and filing disciplinary write-up against employee had no demonstrably adverse employment consequence) (citing *Milburn v. West*, 854 F.Supp. 1, 14 (D.D.C.1994), *aff'd sub nom.*, *Walker v. West*, 1995 WL 117983 (D.C.Cir.1995)).

Thus, the incident did not result in disciplinary action being taken or the imposition of any other demonstrably adverse employment action. With respect to Sgt. Calhoun's violations of the "stay away" order and the defendant's inaction with respect to enforcing the order, the plaintiff's allegations that Sgt. Calhoun walked toward her desk at her newly assigned Sector, and looked at her with a "menacing glare," Pl.'s Stmt. at 9, does not amount to an adverse employment action. Moreover, after Sgt. Hepburn observed Sgt. Calhoun in the office, he immediately approached the plaintiff to determine what Sgt. Calhoun was doing in the office. *Id.* Sgt. Hepburn knew that Sgt. Calhoun should not have been in the office and assured the plaintiff that it would not happen again. *Id.*

On this record, the Court concludes that the plaintiff has failed to adduce evidence of a "significant change in [her] employment status[ ]" sufficient to establish a *prima facie* case of retaliation. *Walker*, 102 F.Supp.2d at 29.

### D. Defendant's Liability for Sgt. Calhoun's Actions

■ "An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee." *Faragher*, 524 U.S. at 777, 118 S.Ct. 2275. However, "[w]hen no tangible employment action is taken [against the employee], a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence." *Id.* at 777–78, 118 S.Ct. 2275 (citing Federal Rule of Civil Procedure 8(c)). "The defense comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Id.* at 778, 118 S.Ct. 2275. "While proof that an employer had promulgated an antiharassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense." *Id.* On the other hand, "proof that an employee failed to fulfill the corresponding obligation of reasonable care to avoid harm is not limited to showing an unreasonable failure to use any complaint procedure provided by the employer, a demonstration of such failure will normally suffice to satisfy the employer's burden under the second element of the defense." *Id.* The affirmative defense is not available "when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment." *Id.*

The defendant posits that it is entitled to prevail on "the affirmative defense because the plaintiff has not alleged or argued that she reported the conduct to someone exercising control over personnel decisions." Defendant District of Columbia's Reply to Plaintiff's Opposition to its Motion for Summary Judgment ("Def.'s Reply") at 8. The defendant further argues that the "[p]laintiff has not alleged nor argued that the conduct was either open and obvious or that the employer knew or should have know[n] of the alleged conduct to someone exercising control over personnel decisions." *Id.* On the other hand, the plaintiff challenges the availability of the affirmative defense arguing that "[a]lthough [the] defendant [did] have an EEO policy in effect for its employees, at the time of [the] plaintiff's harassment[,][the] [d]efen-

dant's enactment of its policy was deeply flawed such that it did not provide the relief it purported to offer." *Id.* at 12. The plaintiff further claims that she "alerted Sgt. Thomas, Inspector Musgrove, and Sgt. Randolph of the harassment of which she was a victim." *Id.* The plaintiff states that in response to her complaints, she was told by the above named individuals to seek assistance at the internal EEO office, however, they did nothing to investigate the plaintiff's complaints and did not contact the internal EEO office themselves. *Id.* The plaintiff further explains that once she reported her problems to the EEO office, that office failed to timely complete its investigation and lost the draft report of the investigative findings and conclusion. *Id.* at 13. Consequently, the plaintiff posits that she "was essentially ignored and did not receive the relief she requested." *Id.* Therefore, the plaintiff contends that she "did try to use the corrective measures [the] MPD claimed were available to its employees and, at the same time, [the] MPD failed to undertake reasonable measures to prevent or correct the harassment of [the] [p]laintiff." *Id.*

Here, the Court has already determined that no tangible employment action was taken with respect to the plaintiff. *See* discussion *infra* Part II(B). Therefore, the defendant is entitled to raise the affirmative defense. *Faragher,* 524 U.S. at 777, 118 S.Ct. 2275. The plaintiff concedes

that "the [d]efendant does have an EEO policy in effect for its employees, [but states that] at the time of [the p]laintiff's harassment [the][d]efendant's enactment of its policy was deeply flawed such that it did not provide the relief it purported to offer." Pl.'s Opp. at 12.[8]

■■■ On the other hand, the defendant cannot show "that [the plaintiff] unreasonably failed to take advantage of any preventive or corrective opportunities provided or to avoid harm otherwise." *Faragher,* 524 U.S. at 778, 118 S.Ct. 2275. As the evidence demonstrates, the plaintiff "alerted Sgt. Thomas, Inspector Musgrove, and Sgt. Randolph of the harassment of which she was a victim." Pl.'s Opp. at 12. Although the plaintiff was advised by each to seek the assistance of the internal EEO office, they did nothing to investigate the plaintiff's claim or to contact the internal EEO office themselves. *Id.* As noted above, on or about July 2, 1998, the plaintiff initially informed Sgt. Thomas of Sgt. Calhoun's conduct that took place at her home. Compl. ¶ 20. Sgt. Thomas "shook his head in disbelief and said he would take care of things." *Id.* Although Sgt. Thomas was not the plaintiff's direct supervisor at the time of this incident, he had in the past given the plaintiff duty assignments when he handled her shift's roll-call. Pl.'s Stmt. at 3. Additionally, on July 7, 1998, after the incident where Sgt. Cal-

**8.** The defendant has not offered any evidence in support of its affirmative defense, particularly with respect to the first prong of the defense—that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior. *Faragher,* 524 U.S. at 778, 118 S.Ct. 2275. For example, there is no discussion of the defendant's internal EEO policy that was in place at the time of the alleged harassment of the plaintiff by Sgt. Calhoun. Rather, the only references to the defendant's internal EEO policy are made by the plaintiff. Therefore, this Court will

accept as true the plaintiff's version of the facts with respect to the defendant's EEO policy and her acknowledgment that there was an EEO policy in place. However, although the policy's existence is significant, as set forth below, it is of no consequence because the defendant otherwise has not shown, by a preponderance of the evidence, that the plaintiff "unreasonably failed to take advantage of any preventive or corrective opportunities provided or to avoid harm otherwise." *Id.*

houn allegedly caressed the plaintiff's breast, the plaintiff also reported this incident to Sgt. Thomas, Compl. ¶¶ 21–22, and she directly asked Sgt. Thomas what he was going to do about Sgt. Calhoun *Id.* ¶ 22. During this conversation, Sgt. Thomas purportedly burst into laughter and agreed to intercede. *Id.* The plaintiff also reported Sgt. Calhoun's behavior to Deputy Chief Musgrove who told her to go immediately to the internal EEO office of the MPD.[9] *Id.* at 23; Pl.'s Stmt. at 4. The plaintiff was under Deputy Chief Musgrove's command for a time while she worked in the Sixth District. *Id.* The plaintiff admits that she did not immediately follow Deputy Chief Musgrove's advice because she was concerned that Sgt. Calhoun would be disciplined if she went to the EEO office.[10] *Id.* Based on these facts, this Court concludes that the defendant is not entitled to summary judgment due to the affirmative defense because the defendant has failed to show, by a preponderance of the evidence, that "the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise." *Faragher*, 524 U.S. at 778, 118 S.Ct. 2275.

### III. Conclusion

For the foregoing reasons, the Court concludes that the plaintiff has established that she was subjected to a hostile work environment resulting from sexual harassment that was created by the actions of Sgt. Calhoun and therefore denies the defendant's motion for summary judgment with respect to that claim. The District of Columbia is also not entitled to summary judgment on the plaintiff's vicarious liability theory based on its assertion of the affirmative defense recognized by the Supreme Court in *Faragher*, 524 U.S. at 777–78, 118 S.Ct. 2275. Finally, the Court further concludes that the plaintiff has failed to establish that she was the victim of retaliation and therefore grants the defendant's motion for summary judgment with respect to that claim.

**SO ORDERED** on this 9th day of July, 2004.[11]

---

9. The plaintiff is unclear about exact dates, but believes that she reported Sgt. Calhoun's behavior to Deputy Chief Musgrove between July 8, 1998 to August 12, 1998. She is positive that the report was not after August 12, 1998. Pl.'s Stmt. at 4.

10. The plaintiff indicates that she also reported Sgt. Calhoun's behavior to Sgt. Randolph. However, as the plaintiff's statement of disputed material facts reflects, she actually reported Sgt. Calhoun's behavior to Sgt. Randolph on April 20, 1999, after she filed her complaint with the EEO office. *See* Pl.'s Stmt. at 6.

11. An Order consistent with this Memorandum Opinion was previously issued on June 30, 2004.